UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


FORREST W. JENKINS, et al.,

           Plaintiffs,                    File No.  1:03-CV-321

v.                                   HON. ROBERT HOLMES BELL

MACATAWA BANK CORPORATION,
et al.,

           Defendants.
_____/

KRISTINE R. STOCKING, et al.,

           Plaintiffs,                    File No.  1:05-CV-460

v.                                   HON. ROBERT HOLMES BELL

MACATAWA BANK CORPORATION,

           Defendant.
_____/

GARY L. and MARY J. TOWLE FAMILY
REVOCABLE TRUST, et al.,

           Plaintiffs,                    File No.  1:05-CV-499

v.                                   HON. ROBERT HOLMES BELL

MACATAWA BANK CORPORATION,
et al.,

           Defendants.

_____/

## AMENDED OPINION

This matter is before the Court on Plaintiffs' Motion for Class Certification.  Plaintiffs in this case invested in various viatical based products offered by Trade Partner, Inc. ("TPI").  Plaintiffs allege that Grand Bank was obligated to provide escrow services to individuals who invested in TPI's viatical based products and that Grand Bank did not fulfil those obligations.  From Defendant Macatawa Bank Corporation ("Macatawa"), successor by merger to Grand Bank, Plaintiffs seek damages for negligence and gross negligence, breach of contract and fraudulent inducement/concealment, breach of fiduciary duty, knowing participation in a breach of fiduciary duty and the unlawful sale of unregistered securities in violation of the Uniform Securities Act.  From Defendant Richard Deardorff, Plaintiffs seek damages for negligence and gross negligence, breach of fiduciary duty, knowing participation in a breach of fiduciary duty and the unlawful sale of unregistered securities in violation of the Uniform Securities Act.  For the reasons that follow, Plaintiffs' Motion for Class Certification is denied.

I.

This suit arises from the sale of investments based on viatical settlements ("viaticals") by TPI between 1996 and 2003.  A viatical settlement is "[a] transaction in which a terminally or chronically ill person sells the benefits of a life-insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's face value." BLACK'S LAW DICTIONARY 1405 (8th ed. 2004).  TPI sold four types of investments based

2

on viaticals: Life Settlement Contracts ("LSCs"), Monthly Income Programs ("MIPs"), Limited Liability Companies ("LLCs") and Inventory Loans.

Between 1996 and 1998 investors in LSCs obtained a direct interest in the viaticated life insurance policies. In 1998 TPI created the TPI Grand Trust. After the creation of the TPI Grand Trust, the Trust was named as the beneficiary on the viaticated insurance policy and the investor obtained an interest in the Trust.

The MIPs and LLCs were structured as loans from the investor to TPI. The investor was to receive monthly payments for two-years and then a balloon payment in the amount of the investor's principal. The loan from the investor to TPI was secured by a pool of viaticated policies. Inventory Loans were a variation on the MIPs and LLCs, in that each loan was secured by a single viaticated policy.

An investor's return on a viatical based investment is dependent on the premiums for the life insurance policy being paid until the viator's death. Plaintiffs' allege that Grand Bank was obligated to escrow funds sufficient to provide for the payment of the premium of each life insurance policy. Plaintiffs' allegations against Deardorff arise from his role as an officer in the Trust Department at Grand Bank from 1996 through December 31, 2001.

TPI opened two different accounts at Grand Bank. In June of 1996 TPI established a Premium Reserve Account at Grand Bank. Then in October of 1998 TPI established a Premium Escrow Account at Grand Bank. Grand Bank's obligations in relation to these two

accounts are at the center of the Plaintiffs' claims; however, the parties substantially disagree about Grand Bank's obligations.

TPI did not place sufficient funds in escrow to pay the policy premiums. Rather, the premiums were largely paid out of current operational cash flow. The failure to place sufficient funds in the escrow account meant that if current operational cash flow was not sufficient, then the policy premiums would not be paid. In early 2001 TPI began to experience difficultly paying the policy premium because the then current operational cash flow was insufficient to meet the premium obligations. TPI eventually collapsed and on April 15, 2003 a receiver was appointed.

Plaintiffs ask the Court to certify a class consisting of:

> all persons or entities, excluding officers or directors of Trade Partners or Macatawa, who purchased or otherwise acquired an interest in the following viatical investment products offered by or through Trade Partners: TPI Monthly Income I through XXXII, LLCs; Life Settlement Contracts; Monthly Income Program ("MIP"); and Inventory Loans.

(First Am. Consol. Class Action Compl., Docket #192, at ¶ 44.) The proposed class contains members from at least forty-three states plus the District of Columbia and at least seventeen countries.[1] (Oct. 4, 2006 Hr'g Tr., Docket #661, at 32:19-24.) In the event that the Court does not certify the above class, Plaintiffs also ask the Court to certify a class consisting of

---

[1] In their briefing on class certification, Defendants indicated that the class contains members from forty-nine states and twenty-four foreign countries. (Macatawa's Opp'n Br., Docket #591, at 4, 42; Deardorff's Opp'n Br., Docket #606, at 11.) The differences between these two estimates do not implicate the Court's analysis of the issue of class certification.

the same types of investors, but limited to investors from Michigan, Texas, Oklahoma, California and Florida.  (Pls.' Reply Br., Docket #613, at 30.)

II.

The Court has "broad discretion in deciding whether to certify a class," but the Court must conduct a "rigorous analysis" of whether the Rule 23 requirements have been met.  *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078-79 (6th Cir. 1996).  "'Maintainability may be determined by the Court on the basis of the pleadings, if sufficient facts are set forth, but ordinarily the determination should be predicated on more information than the pleadings will provide.'"  *Id.* at 1079 (quoting *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974)).  For the purpose of class certification, the rules of evidence are not strictly applied and the Court may consider evidence that would be inadmissible at trial.  *Rockey v. Courtesy Motors, Inc.*, 199 F.R.D. 578, 582 (W.D. Mich. 2001) (Scoville, J.).  "The party seeking the class certification bears the burden of proof."  *In re Am. Med. Sys.*, 75 F.3d at 1079 (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)).

Federal Rule of Civil Procedure 23(a) sets forth four prerequisites for class certification:

> [o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

5

FED. R. CIV. P. 23(a).  If each of these prerequisites is met, then the party seeking class

certification must also show that the class meets one of the three requirements of Rule 23(b).

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Plaintiffs seek certification

under Rule 23(b)(3).  (Pls.' Mot., Docket #537, 18-19.)  Rule 23(b)(3) provides for class

certification if:

> the court finds that the questions of law or fact common to the members of the
> class predominate over any questions affecting only individual members, and
> that a class action is superior to other available methods for the fair and
> efficient adjudication of the controversy.

FED. R. CIV. P. 23(b)(3).  The Court will now consider these requirements in turn.

III.

## A.  Rule 23(a)(1) - Numerosity

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all

members is impracticable." FED. R. CIV. P. 23(a)(1).  Plaintiffs allege that the proposed class

would have at least 2,000 members, and possibly more than 3,000 members.  (Pls.' Mot. 20

& n.5.)  Courts have generally held that numerosity is presumed for a class with more than

forty members.  *E.g.*, *Appoloni v. United States*, 218 F.R.D. 556, 561 (W.D. Mich. 2003)

(Quist, J.) ("[I]t is generally accepted that a class of 40 or more members is sufficient to

establish numerosity.").  Additionally, neither Defendant disputes that the proposed class

meets the numerosity requirement.  The Court finds that the numerosity requirement is met.

6

**B. Rule 23(a)(2) - Commonality**

The second requirement of Rule 23(a) is that "there are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2). The test for commonality is "qualitative rather than quantitative," such that a single issue common to all class members may be sufficient. *In re Am. Med. Sys.*, 75 F.3d at 1080 (quotation omitted). "It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc). The Court must look "for a common issue the resolution of which will advance the litigation." *Id.*

In *Sprague* the district court had certified a class of 50,000 General Motors employees who had taken early retirement. *Id.* at 392-93. The Sixth Circuit reversed the district court's class certification after finding that the class did not meet the commonality and typicality requirements. *Id.* at 398-99. The class claims were a bilateral contract theory and an estoppel theory. *Id.* at 398. In finding commonality lacking, the court noted that there were three different versions of the form that were signed by the class members or that no form was signed. *Id.* Additionally, there were a multitude of different representations that might have been made to each individual retiree. *Id.* Thus, the court concluded that commonality was lacking because proof that General Motors had conferred "vested benefits on one early retiree would not necessarily prove that GM had made such a contract with a different early retiree." *Id.*; *accord Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th

7

Cir. 1998) ("[T]he differences between the [contracts] raise the distinct possibility that there was a breach of contract with some class members, but not with other class members. In such a case, the plaintiffs cannot amalgamate multiple contract actions into one.").

Plaintiffs argue that there were no material variations in the escrow agreements. While Defendants argue that there were material variations in the escrow agreements. All of the parties divide the agreements into three time periods. (Macatawa's Opp'n Br. 15-17; Pls.' Reply Br. 5-7; Oct. 4, 2006 Hr'g Tr. 41:12-43:23.) The parties agree that the first relevant time period started in 1996 and ended in October of 1998. Macatawa contends that the next two time periods are October of 1998 until December of 2001 and December of 2001 until 2003. (Macatawa's Opp'n Br. 16-17.) Plaintiffs contend that the next two time periods are October of 1998 until June of 2000 and June of 2000 until 2003. (Pls.' Reply Br. 6.) Macatawa alleges that there was additional variation based on whether the investor invested in LLCs, LSCs, MIPs or Inventory Loans. Plaintiffs respond that while the structure of the different investments varied, Grand Banks obligations were largely the same for each type of investment. Macatawa's forensic accountant also asserts that the effective dates of new versions of the escrow agreement are not helpful because older versions of the agreement continued to be used even after newer versions were available. (Rock Expert Report ¶ 50, Macatawa's Opp'n Br., Ex. L.) Plaintiffs have not disputed this claim by Macatawa's forensic accountant. Thus, even if the proposed class could be divided into three different groups based on the variations in the contracts, individual class members could only

be placed in the appropriate group after individualized proof about a given investor's contract. The date when a particular investor invested cannot be used because older versions of the contract continued to be used even after newer versions became "effective."

For the purposes of class certification, the Court finds that there were three materially different versions of the agreement. The proposed class would amalgamate these different contracts into a single contract. Commonality is lacking because proof of the obligations imposed by the contracts as to one investor would not necessarily be proof of the obligations imposed by the contracts signed by a different investor.[2]  *Sprague*, 133 F.3d at 398; *Broussard*, 155 F.3d at 340.

The Plaintiffs respond to the arguments about the variations in the escrow agreements by directing the Court's attention to the Agency/Policy Funding Agreements. Even if the Agency/Policy Funding Agreements created obligations for Grand Bank, these agreements also varied over time. For example, an agreement from 1997 only required TPI to pay premiums, while an agreement from 2000 required that the premiums be placed in escrow. (*Compare* Bostian Agency/Policy Funding Agreement ¶¶ 6, 6.7, Macatawa's Opp'n Br., Ex. J, *with* Towle Agency/Policy Funding Agreement ¶¶ 6, 6(g), Macatawa's Opp'n Br., Ex. K.)

---

[2]  The Court's analysis is framed in terms of contractual obligations, but as acknowledged by Plaintiffs, variations in the contractual obligations implicate the other claims. (Pls.' Reply Br. 16 ("[W]hether the Bank met its contractual obligations (an issue which will have to [*sic*] decided in this Court) also will be a threshold issue in deciding many of the tort claims.").)

9

Contrary to Plaintiffs' argument, the Agency/Policy Funding Agreements highlight the lack of commonality. The difference between the agreements from 1997 and 2000 represent two very different sets of obligations. These variations do not remove the lack of commonality, instead these agreements reinforce the lack of commonality arising from variations in the underlying contracts. Thus, the commonality requirement is not met.

## C. Rule 23(a)(3) - Typicality

The third requirement of Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "This test 'limit[s] the class claims to those fairly encompassed by the named plaintiffs' claims.'" *Sprague*, 133 F.3d at 399 (quoting *In re Am. Med. Sys.*, 75 F.3d at 1082) (modification in original). This requirement is summarized with the phrase "'as goes the claim of the named plaintiff, so go the claims of the class.'" *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000) (quoting *Sprague*, 133 F.3d at 399). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d at 1082 (quotation omitted).

Certification is improper if "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim." *Sprague*, 133 F.3d at 399. For either of the proposed classes, all of the claims are essentially based on an alleged failure of Grand Bank to escrow policy premiums. Upon review of Macatawa's summaries, (Macatawa's Class

10

Representatives App., Docket #595), and Plaintiffs' responsive summaries, (Pls.' Reply Br. App. A), the Court finds that the named Plaintiffs are not typical.  "Some class members may have signed the same form, some may have received the same documents . . . but taken as a whole the class claims were based on widely divergent facts."  *Sprague*, 133 F.3d at 399.  A named Plaintiff who proved his or her claim would at best prove the claim of class members who signed the same contract.  Even this is not necessarily true, because the contractual obligations may have been performed as to some investors, but not others.

Moreover, a prevailing named Plaintiff would not prove claims which depend on the representations made to the investor.  A comparison of Gary and Mary Towle (the "Towles") to Gerald Bostian is illustrative of the continuum of representations made to the members of the proposed class.  Through a series of phone calls and other materials the Towles investigated TPI for almost a year before investing.  In September of 1999 Gary Towle flew to Grand Rapids and spent a day visiting with TPI's principals.  Gary Towle also met with Deardorff during the visit.  When the Towles did invest with TPI they hired an attorney "to coordinate and made sure all the paperwork was done appropriately."  (Mary Towle Dep. 37:4-11, Macatawa's Class Representatives App.)  In contrast to the Towles, in 1997 Gerald Bostian invested with TPI relying on his long-time friend and accountant Eddie Elkins. (Bostian Dep. 25:11-16, 61:2-6, Macatawa's Class Representatives App.)  In signing the TPI paperwork, Bostian relied on the explanations provided by Elkins and only briefly reviewed the paperwork himself.  (Bostian Dep. 50:8-14.)  With respect to those claims which involve

11

representations or reliance, an investor such as Bostian is not representative of investors like the Towles and vice versa.  Each named Plaintiff is only typical of class members who invested through a similar process.  There is no basis for concluding that the named Plaintiffs collectively represent the full continuum of processes by which individuals invested with TPI.  If the Court did certify the class, in order to compensate for this lack of typicality the Court would need to take testimony from additional class members.  The court in *Sprague*, however, indicated that the need to take such testimony strongly suggests that class-wide relief is improper.  133 F.3d at 399.  Thus, the typicality requirement is not met.

### D.  Rule 23(a)(4) - Adequacy of the Named Plaintiffs

The fourth and final prerequisite of Rule 23(a) is the requirement that "the representative parties will fairly and adequately protect the interests of the class."  FED. R. CIV. P. 23(a)(4).  The Rule 23(a)(4) requirement is evaluated using  two criteria: "'1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter v. General Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

Applying the "common interest" criteria, the Court finds that there is open antagonism among at least two of the named Plaintiffs and the proposed class.[3]  Macatawa and Deardorff

---

[3]  Macatawa also argues that there is a conflict for Plaintiffs' counsel because of the adversity of the interest of Fox, Polosky and the third-party defendants with the other members of the class.  Plaintiffs respond by arguing that the conflict has been resolved by

have filed a counterclaim against Plaintiffs Matthew J. Fox and David E. Polosky for their roles as brokers of TPI's investments. (Macatawa's Ans. to Am. Compl., Docket #199, at 10-22; Deardorff's Ans. to Am. Compl., Docket #200, at 11-24.) The elements for Plaintiffs' claims under the Michigan Uniform Securities Act ("MUSA") against Defendants are the same as the elements for Defendants counterclaim against Fox and Polosky. *See infra* Part IV.A.5. For the sale of unregistered securities claim, the required proofs will differ in that Defendants will need to establish that Fox and Polosky were "sellers" under the MUSA, but otherwise the proofs will be the same. For the misrepresentation in the sale of a security claim, the required proofs will likely be identical with respect to Polosky. Polosky was the broker for named Plaintiff Kristine Stocking, thus it is likely that in the course of Stocking

---

Fox, Polosky and the other third-party defendants retaining separate counsel for the counterclaim and third-party complaint. (Oct. 4, 2006 Hr'g Tr 99:19-100:8.). The analysis of this alleged conflict is governed by the Michigan Rules of Professional Conduct. W.D. Mich. LCivR.83.1(j) (adopting the Michigan Rules of Professional Conduct to govern ethical considerations). Rule 1.7 of the Michigan Rules of Professional Conduct, dealing with conflicts of interests states:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> (2) each client consents after consultation.

MRPC 1.7. As analyzed in reference to Fox and Polosky, the success of the proposed class on the MUSA claims is adverse to the interest of Fox, Polosky and the third-party defendants. Though the Court need not decide this issue because the Court is not certifying a class, and therefore is not appointing class counsel, it does appear that representing a class comprised of both brokers and non-brokers would result in a conflict of interest for class counsel. The use of separate counsel for the counterclaim and the third-party complaint does not alter the fact that counsel for the class could not serve the interest of the brokers and the non-brokers.

proving the elements of her claim against Defendants, she would prove the elements of Defendants' claim against Polosky. As for the counterclaim against Fox, the required proofs will differ in that Defendants will need to establish that Fox made a misrepresentation. As class representatives, Fox and Polosky would have an interest in the class pursuing claims other than the MUSA claims against Defendants. The overlap regarding the elements of Plaintiffs' claim and the counterclaim against Fox and Polosky creates antagonism that precludes Fox and Polosky from meeting the Rule 23(a)(4) requirements. *See O'Neil v. Appel*, 165 F.R.D. 479, 493-94 (W.D. Mich. 1995) (Scoville, J.).

Macatawa argues that Plaintiffs Gerald Bostian and Kelly Priest do not meet the requirement that they be able to fairly and adequately protect the interests of the class. Macatawa argues that Bostian fails the willingness to vigorously pursue the litigation requirement because at his deposition Bostian indicated that his job places great demands on his time and that he would be unwilling to participate in the case if it caused him to lose his job. Plaintiffs argue that Macatawa is using Bostian's statements out of context and that Bostian indicated a willingness to participate. Bostian's deposition does reveal that his job places substantial demands on his time; however, Bostian repeatedly indicated that he would endeavor to resolve any conflict between the case and his job, so that he would be able to participate in this case. (Bostian Dep. 111:2-6, 112:9-16.) The Court finds that Bostian's statements about resolving any conflict are sufficient to overcome Macatawa's argument that Bostian fails the willingness to vigorously pursue the litigation requirement.

14

Macatawa also argues that Kelly Priest will not adequate protect the interest of the class because he cannot recall much of the information about his dealings with TPI and that therefore he lacks the knowledge relevant to represent the class. Plaintiffs respond that Priest's knowledge is sufficient. However, Priest's deposition is replete with statements indicating an inability to recall the basic facts about his investment with TPI. (Priest Dep. 19:4-23:15, 41:11-17, 48:16-24, Macatawa's Class Representatives App.) A class representative does not need to understand the legal details of the claim being asserted, but in order to fairly and adequately represent the class, a class representative must be able to articulate, in a general sense, what wrong is alleged to have been committed by the Defendants. At his deposition Priest was asked at least twenty times to articulate some minimal description of the claim he makes against the Defendants, but he was unable to do so. (Priest Dep. 83:8-96:19.) In consideration of Priest's lack of recollection of the relevant events and inability to minimally describe his claim, the Court finds that he could not fairly and adequately represent the proposed class.

### E. Summary of the Rule 23(a) Analysis

Rule 23(a) imposes four prerequisites for the certification of a class action. The Court has determined that the proposed class meets the numerosity requirement. After conducting a rigorous analysis, however, the Court determined that Plaintiffs have not met the commonality or typicality requirements. As to the adequacy of the named Plaintiffs, the

Court has found that Plaintiffs Matthew J. Fox, David E. Polosky and Kelly Priest do not meet the adequacy requirements.

The requirements of Rule 23(a) are prerequisites to class certification and Plaintiffs have not met two of those requirements, commonality and typicality.  Therefore, class certification is denied.

Additionally, Plaintiffs have in part not met the adequacy requirement.  Even if the other Rule 23(a) prerequisites had been met, class certification with Fox, Polosky or Priest as class representatives would be improper under Rule 23(a)(4).

IV.

If the Plaintiffs proposed class had met the prerequisites of Rule 23(a), then class certification would only be proper if the proposed class also met the predominance and superiority requirements of Rule 23(b)(3).  After analyzing the predominance and superiority requirements, the Court finds that the proposed class also fails these requirements. Thus, class certification is also denied on these two bases.

**A.  Rule 23(b)(3) - Predominance**

The escrow agreements contain a choice of law provision that requires the application of Michigan law. The terms of the choice of law provision are: "This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Michigan."  (Pls.' Mot., Ex. 13-14, 16, 20-23, 32-33.)  For the purposes of analyzing class certification, the Court will assume, without deciding the issue, that all of the claims are

16

governed by Michigan law.[4]  Regardless of how the choice of law issue is resolved, this case

will only involve the application of state law as all of the asserted claims are state law claims.

### 1.   The Negligence and Gross Negligence Claims

The negligence and the gross negligence claims are asserted against both Macatawa

and Deardorff.   In Michigan the elements of negligence are:  duty, breach of that duty,

causation, and damages.   *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 463, 683

N.W.2d 587 (2004).  "The threshold question in a negligence action is whether the defendant

owed a duty to the plaintiff. 'It is axiomatic that there can be no tort liability unless

defendants owed a duty to plaintiff.'"  *Id*. (quoting *Beaty v. Hertzberg & Golden, P.C.*, 456

Mich. 247, 262, 571 N.W.2d 716 (1997)).  In Michigan the elements of gross negligence are:

"'(1) [k]nowledge of a situation requiring the exercise of ordinary care and diligence to avert

injury to another; (2) [a]bility to avoid the resulting harm by ordinary care and diligence in

the use of the means at hand; (3)[t]he omission to use such care and diligence to avert the

threatened danger, when to the ordinary mind it must be apparent that the result is likely to

---

[4] None of the parties fully briefed the choice of law issue.  Macatawa contends that
for the claims other than the contract claim, that the law of each class member's home state
will apply.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985).  If the law of
each class member's home state did apply to some of the claims, then class certification on
those claims would be improper because the application of the laws of a multitude of states
results in the predominance of individual questions.  *See In re Am. Med. Sys.*, 75 F.3d at
1085; *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217, 223 (W.D. Mich.
1998) (McKeague, J.).

prove disastrous to another.'"  *Kieft v. Barr*, 391 Mich. 77, 80, 214 N.W.2d 838 (1974)

(quoting *Tien v. Barkel*, 351 Mich. 276, 281-82, 88 N.W.2d 552 (1958)).

Plaintiffs allege that Defendants failed to exercise "ordinary care in the performance

of the contractual duties . . . ." and were therefore negligent.  (First Am. Consol. Class Action

Compl. ¶ 50.)  Thus, Plaintiffs acknowledge that proof of the second element of negligence -

the legal duty - will depend on proof of the Defendants' contractual duties.  Proof of the

contractual duties will vary because there were at least three materially different versions of

the contract.  *See supra* Part III.B.  Additionally, any duty owed by Deardorff terminated

when he left Grand Bank, so the class would need to be divided between those who invested

before and those who invested after he left Grand Bank.  *See Schultz v. Consumers Power

Co.*, 443 Mich. 445, 450 (1993) ("Most importantly, for a duty to arise there must exist a

sufficient relationship between the plaintiff and the defendant.").  For those who invested

before Deardorff left, a further division would be necessary based on whether the policy

lapsed for non-payment of premiums before or after Deardorff's departure.  All of these

considerations illustrate that the proofs required for the negligence claim will involve

individualized questions of fact.

The requirement under Michigan law that in tort actions the jury allocate fault among

"all persons that contributed to the injury" will involve individualized questions of fact.

MICH. COMP. LAWS SERV. § 600.6304 (LexisNexis 2005).  At a minimum this will require

the allocation of fault among each investor's broker and TPI.  *See* § 600.6304(1)(b)

18

(indicating that the requirement applies "regardless of whether the person was or could have been named as a party to the action.").  In addition to naming Fox and Polosky as counter-defendants, Macatawa and Deardorff have filed a third-party complaint against 299 individuals who were the principals and outside sales people of TPI.  Section 600.6304 would require that the jury determine for each class member how much fault was attributable to the investor's broker, TPI, Grand Bank and Deardorff.  Even if it was possible to divide this claim into subclasses based on each class member's broker, it would still require close to 300 such subclasses based on the third-party complaints filed by Macatawa and Deardorff. The need for almost 300 subclasses is indicative of the predominance of individual questions.

In response, Plaintiffs contend that the number of third-parties can be reduced to around thirty.  Plaintiffs' support for the contention that the number can reduced to around thirty appears to be that the third-party complaint is "made only on information and belief." (Pls.' Reply Br. 14.)  Plaintiffs' statement is true, but it does not follow that the number will necessarily be substantially reduced prior to trial.  The information provided on each of the named Plaintiffs' transactions does not suggest that there were only a few brokers who completed the vast majority of the transactions.  Even if it were possible to reduce the number of brokers to around ten, individual questions would still predominate because the class would first need to be divided based on the contracts signed by the investor and then subdivided by broker.

19

### 2. The Breach of Contract and Fraudulent Inducement/Concealment Claims

The breach of contract and fraudulent inducement/concealment claims are only asserted against Macatawa. To state a breach of contract claim under Michigan law, Plaintiffs must first establish the elements of a valid contract. See *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453 N.W.2d 304 (1990). The elements of a valid contract are: (i) parties competent to contract, (ii) a proper subject matter, (ii) legal consideration, (4) mutuality of agreement and (5) mutuality of obligation. *McInerney v. Detroit Trust Co.*, 279 Mich. 42, 46, 271 N.W. 545 (1937). For the breach of contract claim, Plaintiffs must prove by a preponderance of the evidence the terms of the contract, that the Defendants breached the terms of the contract, and that the breach caused Plaintiffs' injuries. *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003). As a result of the material variations in the agreements, there would be individualized questions of fact about which contract each investor had and whether there had been a breach with respect to that investor and the applicable contract terms.

Plaintiffs' claim of fraudulent inducement is based solely on a fraud by omission theory. (Pls.' Mot. 34.) In Michigan the elements of fraud by omission are: "'(1) a material representation which is false; (2) known by defendant to be false, or made recklessly without knowledge of its truth or falsity; (3) that defendant intended plaintiff to rely upon the representation; (4) that, in fact, plaintiff acted in reliance upon it; and (5) thereby suffered injury . . . . The false material representation needed to establish fraud may be satisfied by

20

the failure to divulge a fact or facts the defendant has a duty to disclose.'" *McMullen v. Joldersma*, 174 Mich. App. 207, 213, 435 N.W.2d 428 (1988) (quoting *Jaffa v. Shacket*, 114 Mich. App. 626, 640-41, 319 N.W.2d 604 (1982)).  Plaintiffs argue that Michigan law does not require proof of individual reliance for a fraud by omission claim.  *Clement-Rowe v. Michigan Health Care Corp.*, 212 Mich. App. 503, 507-08, 538 N.W.2d 20 (1995) (per curiam).  The language in *Clement-Rowe* is ambiguous as to whether reliance is an element of fraud by omission.  However, subsequent decisions of the Michigan Court of Appeals have made clear that reliance is an element of fraud by omission. *UAW-GM Human Resource Ctr. v. KSL Rec. Corp.*, 228 Mich. App. 486, 504, 579 N.W.2d 411 (1998);  *Wetzel v. Consumers Power Co.*, No. 202570, 1998 Mich. App. LEXIS 1158, at *9-10 (Mich. Ct. App. Oct. 30, 1998);  *Sneyd v. Int'l Paper Co.*, 142 F. Supp. 2d 819, 823 (E. D. Mich. 2001) (Gadola, J.) (Using *McMullen* as the statement of fraud by omission in Michigan).

Plaintiffs further argue that in fraud by omission cases, if the omission was material then a presumption of reliance applies. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972). *Affiliated Ute* involved a presumption under federal securities law.  406 U.S. at 153-54 (discussing Rule 10b-5).  Though some states have applied *Affliated Ute* to common law fraud, Michigan has not.  *McClain v. Coverdell & Co.*, 272 F. Supp. 2d 631, 640 n.7 (E.D. Mich. 2003)  (Tarnow, J.) (reviewing Michigan and federal cases and holding that the *Affiliated Ute* presumption does not apply to fraud claims in Michigan).

In Michigan, fraud by omission requires proof of individual reliance, so individual questions predominate. *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ([A] fraud class action cannot be certified when individual reliance will be an issue."); *O'Neil*, 165 F.R.D. at 499 ("Where numerous mini-trials are necessary to resolve individual questions of reliance and causation, the benefits of a class action disappear.").

### 3. *The Breach of Fiduciary Duty Claim*

The breach of fiduciary duty claim is asserted against both Macatawa and Deardorff. In Michigan a breach of fiduciary duty occurs when a "position of influence has been acquired and abused, or when confidence has been reposed and betrayed." *Vicencio v. Ramirez*, 211 Mich. App. 501, 508; 536 N.W.2d 280 (1995) (per curiam); *accord Prentis Family Found., Inc. v. Barbara Ann Karmanos Cancer Inst.*, 266 Mich. App. 39, 47, 698 N.W.2d 900 (2005) (per curiam). "[T]he duties and liabilities imposed on an escrow agent are those set forth in the escrow agreement." *Hills of Lone Pine Ass'n v. Texel Land Co.*, 226 Mich. App. 120, 124, 572 N.W.2d 256 (1997) (citing *Smith v. First Nat'l Bank & Trust Co. of Sturgis*, 177 Mich. App. 264, 268; 440 N.W.2d 915 (1989)). Plaintiffs claim that Grand Bank and Deardorff had fiduciary duties based on the escrow agreements. However, the escrow agreements materially varied between 1996 and 2003. *See supra* Part III.B. The variation in the escrow agreements will necessitate an individualized inquiry as to the terms of each investor's agreement and whether those terms were violated. Thus, the fiduciary duties owed by Defendants are individualized questions.

22

Plaintiffs respond that the fiduciary duties owed by the Defendants are a common question because the bank was a trustee. *Frost v. Frost*, 165 Mich. 591, 594, 131 N.W. 60 (1911) ("Every person who receives money to be paid to another or to be applied to a particular purpose, to which he does not apply it, is a trustee, and may be sued, either at law for money had and received, or in equity as a trustee for a breach of trust."). First, how accurately *Frost* states Michigan law is unclear as it has only been cited once by a Michigan court. *In re Estate of Edgar*, 137 Mich. App. 419, 427, 357 N.W.2d 867 (1984), *rev'd* 425 Mich. 364, 389 N.W.2d 696 (1986). Second, the language in *Frost* is not inconsistent with either *Hills of Lone Pine Ass'n* or *First National Bank & Trust Co. of Sturgis*. *Frost* describes one way in which a person can become a fiduciary, while *Hills of Lone Pine Ass'n* and *First National Bank & Trust Co. of Sturgis* describe the duties of a particular type of fiduciary.

Plaintiffs also claim that Grand Bank and Deardorff had fiduciary duties based on Grand Bank having been the co-trustee of the TPI Grand Trust. The TPI Grand Trust was not a traditional property trust, rather it was a Delaware Business Trust. (TPI Grand Trust - Trust Agreement, Pls.' Mot., Ex. 24.) Grand Bank was designated as the "Property Trustee." (TPI Grand Trust - Trust Agreement Preamble.) The trust agreement gave the Property Trustee the power to: (i) establish bank accounts for the trust, (ii) receive death benefits from the policies and (iii) to distribute the proceeds from the policies in accordance with the trust agreement. (*Id.* at ¶ 5.2.) The trust agreement also expressly limits the Property Trustee's

liability to violations of the aforementioned duties.  (*Id.* at ¶ 5.3(b).)  Delaware law permits a business trust agreement to impose such limitations on liability.  DEL. CODE ANN. tit. 12 § 3806(e) (2006) ("A governing instrument may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a trustee . . . to a . . . beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument . . . .").  Plaintiffs' allegations of a breach of fiduciary duty are not within categories for which the TPI Grand Trust permits Defendants to be liable. Thus, the TPI Grand Trust cannot be used to overcome the fact that a fiduciary duty claim under Michigan law requires proof of individual reliance.

Similar to the negligence and gross negligence claims, as to Deardorff this claim would need to be divided into subclasses because Deardorff left Grand Bank on December 31, 2001.  Deardorff was a fiduciary in his capacity as a trust officer at Grand Bank.  When he ceased to be a trust officer, he also ceased to be a fiduciary.  So the class would need to be divided in consideration of this.

Individual questions will therefore predominate with respect to the breach of fiduciary duty claim.

### 4.  *The Knowing Participation in a Breach of Fiduciary Duty Claim*

The knowing participation in a breach of fiduciary duty claim is asserted against both Macatawa and Deardorff.  Michigan law provides that "[w]here a person in a fiduciary relation to another violates his duty as fiduciary, a third person who participates in the

24

violation of duty is liable to the beneficiary." *Hayes-Albion v. Kuberski*, 421 Mich. 170, 186, 364 N.W.2d 609 (1984). Plaintiffs allege that the Defendants knowingly participated in TPI's breach of its fiduciary duties.

Plaintiffs will have to prove that TPI breached a fiduciary duty in order to prove that Defendants knowingly participated in TPI's breach of its fiduciary duties. TPI's fiduciary duties, like those of Defendants, will depend on the obligations imposed by the underlying contracts. *Hills of Lone Pine Ass'n*, 226 Mich. App. at 124; *First Nat'l Bank & Trust Co of Sturgis*, 177 Mich. App. at 268. Therefore, the proofs as to TPI's fiduciary duties will require the same degree of individualized proof as would be required for Defendants' alleged breach of fiduciary duties. *See supra* Part IV.A.3.

### 5. The Unlawful Sale of Unregistered Securities in Violation of the Uniform Securities Act Claim

Plaintiffs allege two separate violations of the Michigan Uniform Securities Act ("MUSA") against both Macatawa and Deardorff. First, Plaintiffs allege Defendants violated the MUSA by selling unregistered securities that were required to be registered. Second, Plaintiffs allege Defendants violated the MUSA by making misstatements and material omissions in the course of selling viatical investments. As a preliminary matter, viaticals are securities under the MUSA. *Michelson v. Voison*, 254 Mich. App. 691, 696-97, 658 N.W.2d 188 (2003).

A violation of the MUSA for the sale of unregistered securities that were required to be registered requires proof of the following elements: (i) the Defendants sold (ii) a security

(iii) that was required to be registered under the MUSA (iv) but was not registered.  MICH. COMP. LAWS. SERVICE § 451.701 (LexisNexis 2001).[5]  To prove that Defendants sold securities it will be necessary to prove that Grand Bank was a "seller" and that Deardorff was an agent of Grand Bank.  The MUSA defines "sale" and "sell," but it does not define who constitutes a seller.  MICH. COMP. LAWS. SERVICE § 451.801 (LexisNexis 2001) (defining terms used in the MUSA).  For the purposes of analyzing class certification, "seller" is defined as a question of "whether the defendant either passed title or offered to do so, or solicited an offer."  *Smith v. American Nat'l Bank & Trust Co.*, 982 F.2d 936, 942 (6th Cir. 1992);  *Michelson*, 254 Mich. App. at 695 (finding it appropriate to look to decisions interpreting federal securities law to interpret the MUSA); *People v. Breckenridge*, 81 Mich. App. 6, 16-17, 263 N.W.2d 922 (1978) (same).  Resolving whether Grand Bank was a "seller" will at a minimum involve questions about whether an investor met or spoke with a Grand Bank representative and whether the investor received any materials produced by

---

[5] In 2000 the Michigan Legislature revised the MUSA.  2000 MICH. PUB. ACTS 494. The revisions were effective January 11, 2001.  The effective date of the revisions means that part of the proposed class is governed by the old version and part of the class is governed by the new version.  The revisions did include changes to Michigan Compiled Laws §§ 451.501, 451.701, however, those changes did not alter the elements for the claims asserted by Plaintiffs.  So while the MUSA claims of class members would be governed by two technically different versions of the statute, the elements for the MUSA claims would not be different.  *Compare* MICH. COMP. LAWS. SERVICE § 451.701 (LexisNexis 2001) *with* MICH. COMP. LAWS. SERVICE § 451.701 (LexisNexis Supp. 2006); *compare* MICH. COMP. LAWS. SERVICE § 451.501 (LexisNexis 2001) *with* MICH. COMP. LAWS. SERVICE § 451.501 (LexisNexis Supp. 2006).  For simplicity, in the remainder of the opinion the Court only cites to the statute as it existed prior to the revisions enacted in 2000, i.e., MICH. COMP. LAWS. SERVICE § 451.701 (LexisNexis 2001).

Grand Bank.  Reference to the Court's earlier comparison of Gary and Mary Towle to Gerald Bostian is illustrative of how the variations in the transactions necessitate individualized proof as to whether Grand Bank was a "seller."  Bostian never communicated  with Grand Bank in relation to investing with TPI,[6] whereas the Towles met with Deardorff for around thirty-minutes as part of a day-long sales pitch from TPI.[7]  Individual questions predominate as to the sale of unregistered securities claim because the representations made to each investor will determine whether Grand Bank was a "seller" with respect to that investor.

A violation of the MUSA for the sale of securities through the use of material omissions or untrue statements requires proof of the following elements: (i) Defendants made in connection with the (ii) sale or offer of  (iii) a security (iv) material omissions or untrue statements.  MICH. COMP. LAWS SERVICE §451.501 (LexisNexis 2001).  Plaintiffs allege that Defendants made representations or allowed representations to be made which were materially false with respect to the escrow of funds for the payment premiums.  Similar to the claim under § 451.701, the claim under § 451.501 will involve individualized questions

---

[6] At some point Bostian did speak with a representative from Grand Bank, however, that conversation was in reference to a money market account Bostian's mother had with Grand Bank.  (Bostian Dep. 82:1-13.)

[7] The Court's use of the Towles and Bostian for this illustration is only in reference to the marketing presentations they received.  The Court is not referring to the fact that the Towles made their initial investment using United Trade Bureau dollars.  For their first viatical based investment the Towles purchased a viatical based investment from Malkeet and Balwant Singh who had previously invested with TPI and paid the Singhs with United Trade Bureau dollars.  There has not been any argument that a large number of investors went through a third-party, such as the United Trade Bureau, so the Court did not consider such facts in analyzing the issue of class certification.

because of the variations in the representations made.   Plaintiffs contend that the representations made to investors were uniform.   However, the named Plaintiffs have provided varied accounts about the representations that were made to them.   Plaintiffs' contention that the representations were uniform is inconsistent with the statements from the named Plaintiffs themselves.

As analyzed under Michigan law, it is quite clear that all of the Plaintiffs' claims will involve individualized questions of fact.   In consideration of each claim involving individualized questions of fact, common questions do not predominate.

### B.  Rule 23(b)(3) - Superiority

To certify a class under Rule 23(b)(3) the court must determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).   Normally a proposed class with a large number of members offers substantial efficiency gains.   However, those efficiency gains are dissipated if there is, as there is in this case, a large number of individual questions of fact.   *See Castano*, 84 F.3d at 745 n.19;   *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. at 223.

Rule 23(b)(3) provides a non-exhaustive list of four factors for the Court to consider with regard to the superiority of class adjudication.   As to the first two factors, the fact that only one other suit has been filed against the Defendants favors class adjudication.   The third factor, the desirability of concentrating the claims in this forum, also favors class adjudication.   TPI was, and Macatawa is, based in the Western District of Michigan.

28

Additionally, the choice of law clauses all specify the application of Michigan law.  Thus, the first three factors support class adjudication.  The fourth factor requires the Court to consider  "the difficulties likely to be encountered in the management of a class action."  FED. R. CIV. P. 23(b)(3)(D).  In this case, the predominance of individual questions of fact, the absence of commonality, and the absence of typicality, preclude the case from being manageable.  *See Castano*, 84 F.3d at 745 n.19;  *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir. 1986).  Each of those factors precludes a finding of manageability because those factors would require the Court to conduct a multitude of separate factual inquiries if the Court certified a class.  The advantages of class adjudication are outweighed by the disadvantages, when compared to the other available means of adjudication.  *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 632-33 (3d Cir. 1996).

Plaintiffs respond to the manageability concerns by suggesting that the Court could create subclasses.  However, the creation of subclasses would not resolve the manageability issues.  The individual questions of fact do not provide clearly ascertainable demarcations which would delineate which class members belong to each subclass.  Subclasses based on particular dates or types of investments would not correspond to the various individual question of fact.  These barriers to manageability preclude class adjudication from being a superior method of resolving this dispute.

### C. Plaintiffs' Alternative Class Definition

Plaintiffs' reply brief proposed an alternative class that would be limited to investors from Michigan, Texas, Oklahoma, California and Florida. (Pls.' Reply Br. 30.) This proposed alternative class does not resolve the absence of commonality, the absence of typicality or the inadequacy of some of the named Plaintiffs. Moreover, this proposed alternative class would do nothing to improve the predominance of individual questions of fact or to make class adjudication superior. Thus, just as the Plaintiffs' original proposed class does not meet the Rule 23 requirements, Plaintiffs' alternative proposed class does not meet the Rule 23 requirements.

V.

For the foregoing reasons, Plaintiffs' Motion for Class Certification is denied. An order will be entered consistent with this opinion.

Date:   November 9, 2006        /s/ Robert Holmes Bell
                                ROBERT HOLMES BELL
                                CHIEF UNITED STATES DISTRICT JUDGE

30