UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re TRADE PARTNERS, INC.
INVESTORS LITIGATION.

File No. 1:07-MD-1846

ALL CASES

_____/

## OPINION REGARDING MACATAWA'S AND
## THE MAIERS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This matter is before the Court on three motions.  First, Macatawa Bank and

Macatawa Bank Corporation (collectively "Macatawa") move for partial dismissal and/or

summary judgment as to several of Plaintiffs' claims.  (Dkt. No. 140,[1] Macatawa's Mot. for

Partial Summ. J.)  Second, in the *Adamson v. Macatawa* case, Plaintiffs Ronald and Rebecca

Maier move for partial summary judgment on their breach of contract claim.  (File No. 1:07-

CV-750, Dkt. No. 104, Maiers' Mot. for Partial Summ. J.)   Third, Plaintiffs move for the

declaration of Brian Downs to be disregarded.[2]  (Dkt. No. 227, Pls.' Mot. to Strike.)  On

---

[1]Unless otherwise indicated, all docket numbers in this opinion refer to the docket for
File No. 1:07-MD-1846.

[2]Plaintiffs' motion for the declaration of Brian Downs to be disregarded was
originally filed as a motion to strike Macatawa's motion for partial dismissal and/or summary
judgment or, in the alternative, to disregard the declaration of Brian Downs.  On
July 14, 2008, the Court issued a memorandum opinion and order that denied Plaintiffs'
motion to strike Macatawa's motion for partial dismissal and/or summary judgment and
indicated that the motion to disregard the declaration of Brian Downs would be addressed
with the substance of Macatawa's motion for partial summary judgment.  (Dkt. No. 303,
Mem. Op. re Decl. of Brian Downs.)

July 28, 2008, the Court heard oral argument on these motions. For the reasons that follow, Macatawa's motion for partial dismissal and/or summary judgment will be granted in part and denied in part, Plaintiffs Ronald and Rebecca Maier's motion for partial summary judgment on their breach of contract claim will be denied, and Plaintiffs' motion for the declaration of Brian Downs to be disregarded will be denied as moot.

## I. Background

### A.  Factual Background

This MDL action arises from the sale of viatical settlements by Trade Partners Inc. ("TPI") between 1996 and 2003. Defendant Macatawa Bank is a member bank of Defendant Macatawa Bank Corporation. Macatawa Bank is the successor by merger to Grand Bank. Grand Bank provided certain banking services related to TPI's viatical settlements. Many of the events relevant to these motions occurred prior to the merger; however, consistent with the Court's practice in earlier opinions in this MDL action, the Court refers to Grand Bank as Macatawa. (*E.g.*, Dkt. No. 25, 11/06/2007 Op. 2 n.2; Dkt. No. 211, 04/15/2008 Op. 2 n.2.)

Plaintiffs Ronald and Rebecca Maier are residents of Yukon, Oklahoma. Plaintiffs Maiers allege that they made three investments with TPI totaling $34,200. (File No. 1:07-CV-750, Dkt. No. 101, *Adamson* Pls.' Sixth Am. Compl., App. 4, TPI Investor Spreadsheet 3.) Plaintiffs Maiers made their initial investment with TPI in March of 1999.

**B.      Procedural Background**

On June 26, 2007, the Judicial Panel on Multidistrict Litigation transferred four cases involving individuals who had invested with TPI then pending outside of the Western District of Michigan to be consolidated with *Jenkins v. Macatawa*, which was already pending in the Western District of Michigan.  (*See* 11/06/2007 Op. 2-3 (detailing the procedural history of the transferred cases).)  On January 22, 2008, the Court issued its initial case management order for this MDL action, which provided for the parties to file global dispositive motions by March 3, 2008.  (Dkt. No. 97, Initial Case Mgmt. Order ¶ 7.b.) Two of the global dispositive motions that have been filed are Macatawa's motion for partial dismissal and/or summary judgment as to several of Plaintiffs' claims and Plaintiffs Maiers' motion for partial summary judgment on their breach of contract claim.  On July 11, 2008, the Court entered an opinion and order that determined that all claims, except the state securities law claims, are governed by Michigan law.  (Dkt. Nos. 301-02, Op. re Choice-of-Law & Order re Choice-of-Law.) Although Macatawa's motion involves the state securities law claims, Macatawa's motion only addresses the state securities law claims that are asserted under the Michigan Uniform Securities Act ("MUSA").  Therefore, all of the substantive issues presented by Macatawa's and Plaintiffs Maiers' motions are governed by Michigan law.

## II.  Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.[3]  In evaluating a motion for summary judgment the court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial.

---

[3]Macatawa's motion asks the Court to resolve issues under both Rule 12(b)(6) as a motion to dismiss for failure to state a claim and under Rule 56 as a motion for summary judgment.  As Macatawa moved for summary judgment, the Court is not converting the motion to a motion for summary judgment.  *Cf.* Fed. R. Civ. P. 12(d).  If the Court were converting the motion, then, "whether notice of conversion of a motion to dismiss to one for summary judgment by the court to the opposing party is necessary depends upon the facts and circumstances of each case."  *Salehpour v. Univ. of Tenn.,*  159 F.3d 199, 204 (6th Cir. 1998) (citing *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 393 (6th Cir. 1975)).  "Where one party is likely to be surprised by the proceedings, notice is required."  *Id.* (citing *Dayco Corp.*, 523 F.2d at 393).  Macatawa filed its motion as both a motion to dismiss and a motion for summary judgment, so Plaintiffs had notice Macatawa was seeking to have the Court resolve the issues presented on summary judgment. Moreover, Plaintiffs responded to Macatawa's motion with over four hundred pages of material  (Dkt. No. 221, Farrell Aff., Exs. 1-53), indicating that they did in fact have a reasonable opportunity to respond. *Id.* at 204 (finding that a plaintiff had a reasonable opportunity to respond when he had time to respond and had in fact responded with over two hundred pages of material). Lastly, at the hearing on this motion the only issue on which Plaintiffs even suggested a possibility of prejudice if the Court resolved the issue on summary judgment was with respect to Macatawa's arguments for summary judgment on the MUSA claims.  However, Plaintiffs' contentions of prejudice are moot, because as the Court explains in Section III.F.1 - *Seller under the MUSA*, Macatawa is not entitled to summary judgment on Plaintiffs' claims that Macatawa was the seller of unregistered securities.  There is not an issue of prejudice with respect to the Court's granting of summary judgment on the MUSA claims that Macatawa was a person who controlled a seller of unregistered securities, *see infra* Section III.F.2 - *A person who controls a seller under the MUSA*, because Plaintiffs did not respond to that argument under Rule 12(b)(6) or 56.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

When the moving party has the burden of proof, however, a somewhat different standard applies. "'[W]here the moving party has the burden – the plaintiff on a claim for relief or defendant on an affirmative defense – his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (quoting 11 James Wm. Moore, et al., *Moore's Federal*

*Practice* § 56.13[1], at 56-138 (3d ed. 2000)). Thus, "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III. Analysis

### A. Statute of limitations for the breach of contract claims

Macatawa moves for summary judgment on the breach of contract claims based on the breach of contract claims being barred by the statute of limitations. Under Michigan law, the statute of limitations for breach of contract actions is six years. M.C.L.A. § 600.5807(8) (West 2008). Plaintiffs contend that their breach of contract claims are not governed by the statute of limitations in M.C.L. § 600.5807(8), but by the statute of limitations in M.C.L. § 600.5855. Michigan Compiled Laws § 600.5855 provides a two-year statute of limitations that runs from the date that the person entitled to sue discovers, or should have discovered, the claim if the person liable for the claim "fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim . . . ." M.C.L.A. § 600.5855 (West 2008).

> As a general rule, for fraudulent concealment to postpone the running of the period of limitation, the fraud must be manifested by an affirmative act or misrepresentation. An exception to this rule is that there is an affirmative duty to disclose where the parties are in a fiduciary relationship.

*Brownell v. Garber*, 199 Mich. App. 519, 527, 503 N.W.2d 81 (1993) (quoting *Lumber Village, Inc. v. Siegler*, 135 Mich. App. 685, 694-95, 355 N.W.2d 654 (1984)). Plaintiffs

contend that they do not need to show an affirmative act or misrepresentation because of Macatawa's fiduciary duty to Plaintiffs as an escrow agent. Assuming that the affirmative act or misrepresentation requirement is inapplicable because Macatawa and Plaintiffs were in a fiduciary relationship, Plaintiffs still have the burden of establishing that Macatawa fraudulently concealed the breach of contract. *Id.* at 531 (acknowledging that the defendant owed a fiduciary duty to the plaintiff and then stating that the "essential point is that in order to be within the statutory period of limitation plaintiff must prove that defendant fraudulently concealed the existence of the cause of action . . . ."). Plaintiffs have not identified any evidence supporting the contention that Macatawa fraudulently concealed the breach of contract from Plaintiffs. (Dkt. No. 219, Pls.' Resp. in Opp'n 33-34; Dkt. No. 220, *Elkins* Pls.' Resp. in Opp'n (making no reference to Macatawa's statute of limitations argument).) Hence, as a matter of summary judgment, Macatawa did not fraudulently conceal the breach of contract from Plaintiffs. In the absence of fraudulent concealment of the claim from Plaintiffs, M.C.L. § 600.5855 is inapplicable.

As Plaintiffs' breach of contract claims are governed by M.C.L. § 600.5807(8), the Court must determine the application of M.C.L. § 600.5807(8). "A claim accrues, for purposes of the statute of limitations, when suit may be brought." *AFSCME, AFL-CIO, Mich. Council 25 and Local 1416 v. Highland Park Sch. Dist. Bd. of Educ.*, 457 Mich. 74, 90, 577 N.W.2d 79 (1998) (plurality opinion) (citing *Harris v. Allen Park*, 193 Mich. App. 103, 106, 483 N.W.2d 434 (1992), and *Smith v. Treasury Dep't*, 163 Mich. App. 179, 183,

414 N.W.2d 374 (1987)).  "For contract actions, the limitation period generally begins to run on the date of the contract breach."  *Id.* (plurality opinion) (citing *Harris*, 193 Mich. App. at 106).

Plaintiffs' complaints allege that Macatawa breached its contractual obligations, but do not identify what contract term was breached.   (File No. 1:03-CV-321, Dkt. No. 916, *Jenkins* Pls.' Second Am. Consol. Class Action Compl. ¶¶ 63-67;  File No. 1:07-CV-738, Dkt. No. 114, *Bailey* Pls.' Fourth Am. Compl. ¶¶ 45-48;  *Adamson* Pls.' Sixth Am. Compl. ¶¶ 45-48;  File No. 1:07-CV-751, Dkt. No. 1, *Elkins* Pls.' Compl. ¶¶ 26-29;  File No. 1:07-CV-775, Dkt. No. 103, *Myers* Pls.' Third Am. Compl. ¶¶ 45-48.)   In the portion of Macatawa's motion for summary judgment that addresses the substance of Plaintiffs' breach of contract claims, Macatawa contends that the alleged breach was a failure to escrow funds sufficient to pay the premiums for the life insurance policies upon which TPI's viatical settlements were based.  Plaintiffs' response on the statute of limitations issue does not contravene this contention; however, in response to Macatawa's arguments on the substance of the breach of contract claims, Plaintiffs argue that in addition to the escrow based breach, there was a breach of contract in relation to verification of the insurance documents.  As the Court explains in Section III.B.2 - *Verification of insurance policy documents for plaintiffs who signed an escrow agreement with Macatawa*, Macatawa is entitled to summary judgment on Plaintiffs' contention that there was a breach of contract related to the verification of the insurance documents.  Thus, the statute of limitations for the breach of

contract claims must be assessed based on the alleged failure to escrow funds sufficient to pay the premiums of the insurance policies underlying the viatical settlements.

Plaintiffs contend that the breach did not occur on the date of investment, but on the date Macatawa released funds to TPI in breach of Macatawa's contractual obligations. Macatawa contends that for the purposes of the statute of limitations, the time of any breach of contract occurred when each plaintiff invested. Macatawa's contention fails because there could not have been a breach of the type alleged by Plaintiffs until Macatawa dispersed a plaintiff's funds to TPI. Even if Macatawa was not holding a plaintiff's funds solely because of Macatawa's contractual obligations to that plaintiff, Macatawa was still acting in conformity with the contractual obligations alleged by Plaintiffs until it dispersed funds in a manner contrary to those contractual obligations. Therefore, the six-year statute of limitations for the breach of contract claims, M.C.L. § 600.5807(8), begins to run on the date that Macatawa dispersed funds in a manner contrary to its contractual obligations to escrow funds sufficient to pay insurance policy premiums.

A putative class action was filed on behalf of Plaintiffs, so the Court must determine if the statute of limitations was tolled for any period of time. Because Michigan law supplies the applicable statute of limitations, Michigan's tolling principles also govern. *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 567 (6th Cir. 2005) (citing *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 265 (7th Cir. 1998)). Under Michigan law, the statute of limitations is tolled from the filing of a putative class action until the denial of

class certification. *Warren Consol. Schs. v. W.R. Grace & Co.,* 205 Mich. App. 580, 585-86, 518 N.W.2d 508 (1994) (applying the holding of *Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 353-54 (1983) to a state court plaintiff where there was a previous federal class action); *see also* MCR 3.501(F)(1), (F)(2)(c) (providing tolling for state court class actions). A class action complaint was filed in *Jenkins v. Macatawa* on May 9, 2003. (File No. 1:03-CV-321, Dkt. No. 1, *Jenkins* Pls.' Class Action Compl.) The Court denied class certification on November 8, 2006. (File No. 1:03-CV-321, Dkt. No. 676, 11/08/2006 Order.) Macatawa is entitled to summary judgment as to any breach of contract claim by a plaintiff for whom more than six years passed between Macatawa dispersing funds in a manner contrary to its contractual obligations to escrow funds sufficient to pay insurance policy premiums and the plaintiff filing a lawsuit alleging breach of contract against Macatawa, after tolling the statute of limitations from May 9, 2003, until November 8, 2006.[4]

## B. Substance of the Breach of Contract Claims

Under Michigan law, to prevail on a breach of contract claim a plaintiff must prove: (1) the existence of a contract, (2) the terms of the contract, (3) that the defendant breached

---

[4]In accordance with Macatawa's motion being on the global dispositive issues, Macatawa has not moved as to individual plaintiffs, but as to categories of plaintiffs. Macatawa has indicated that it will move for summary judgment as to individual plaintiffs after the Court issues its opinion on this motion for partial summary judgment based on the categories for which the Court grants summary judgment in this opinion. No party has contended that there are not plaintiffs in each of the categories addressed in this motion, so there is no question that each category addressed by this opinion presents an actual dispute of fact or law between parties to this MDL action.

the contract, and (4) that the breach caused the plaintiff's injury. *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999) (applying Michigan law). Macatawa moves for summary judgment as to Plaintiffs' breach of contract claims.

### 1. Plaintiffs who did not have a contract with Macatawa

Macatawa moves for summary judgment on the breach of contract claims of plaintiffs who did not have a contract with Macatawa. "To state a breach of contract claim under Michigan law, a plaintiff must first establish the elements of a valid contract." *In re Brown*, 342 F.3d 620, 628 (6th Cir. 2003) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765, 453 N.W.2d 304 (1990)) (applying Michigan law). The elements of a valid contract are: "parties competent to contract, a proper subject-matter, a legal consideration, mutuality of agreement, and mutuality of obligation." *Detroit Trust Co. v. Struggles*, 289 Mich. 595, 599, 286 N.W. 844 (1939) (citing *John v. Douglas*, 281 Mich. 247, 274 N.W. 780 (1937)). Macatawa contends that the following types of plaintiffs did not have a contract with Macatawa: plaintiffs who invested with TPI before Macatawa had a relationship with TPI, plaintiffs who invested in TPI's Sojkara, IWM, and inventory loan products, and plaintiffs who purchased TPI's viatical settlements from a third-party.

Plaintiffs did not respond with respect to plaintiffs who invested with TPI before Macatawa had a relationship with TPI, therefore Macatawa is entitled to summary judgment as to the breach of contract claims of plaintiffs who invested with TPI before Macatawa had a relationship with TPI.

As to TPI's Sojkara, IWM, and inventory loan products, only the *Elkins* Plaintiffs acknowledge this part of Macatawa's motion. (*Elkins* Pls.' Resp. in Opp'n 5 & n.3.) However, the *Elkins* Plaintiffs simply acknowledge that one investment made by one of the *Elkins* Plaintiffs was an inventory loan, without offering any analysis of how such an investment supports a breach of contract claim against Macatawa. (*Id.*) As Plaintiffs have not articulated the basis on which plaintiffs who invested in TPI's Sojkara, IWM, and inventory loan products have a breach of contract claim against Macatawa, Macatawa is entitled to summary judgment as to the breach of contract claims of plaintiffs who invested in TPI's Sojkara, IWM, and inventory loan products.

With respect to plaintiffs who purchased TPI's viatical settlements from a third-party, Plaintiffs contend that such plaintiffs succeed to the contractual rights of the original purchaser. (Pls.' Resp. in Opp'n 3 n.3.) Macatawa contends in its reply that such plaintiffs do not succeed to the contractual rights of the original purchaser. (Dkt. No. 277, Macatawa's Reply in Supp. 6.) Neither Macatawa nor Plaintiffs have cited any legal authority in support of their respective positions about third-party purchasers. Under Michigan contract law, "rights can be assigned unless the assignment is clearly restricted." *Burkhardt v. Bailey*, 260 Mich. App. 636, 653, 680 N.W.2d 453 (2004) (citing Calamari & Perillo, *Contracts* § 18-10, at 735 (3d ed.)). "An assignee stands in the position of the assignor, possessing the same rights and being subject to the same defenses." *Id.* (citing *Nichols v. Lee*, 10 Mich. 526, 528-29 (1862)). No party has identified any language in the

agreements signed by the individuals who invested through TPI that would prohibit such investors from assigning their rights to a third-party. Therefore, Macatawa is not entitled to summary judgment as to the breach of contract claims of plaintiffs who purchased TPI's viatical settlements from a third-party.

### 2. Verification of insurance policy documents for plaintiffs who signed an escrow agreement with Macatawa

In order to successfully assert a breach of contract claim, the plaintiff must allege that the defendant's breach caused the plaintiff's injury. *Webster*, 197 F.3d at 819. Macatawa initially moved for summary judgment as to whether it had breached the escrow agreements. In response to Macatawa's motion, Plaintiffs offered two different theories of Macatawa's breach: (1) failure to verify the insurance documents, and (2) failure to escrow funds for payment of the insurance policy premiums. The Court will first address Plaintiffs' theory that Macatawa failed to verify the insurance documents. Plaintiffs contend that Macatawa was required to verify that the insurance documents met three requirements: (1) that the documents Macatawa received have been executed by a designated representative of the insurer, (2) that the owner of the policy had been changed, and (3) that the beneficiary of the policy had been irrevocably changed. Who was to be designated beneficiary and owner varied throughout Macatawa's relationship with TPI, but Plaintiffs' contention is that for each investor, there were certain changes in the insurance documents that Macatawa was to verify had taken place before releasing funds to TPI. Plaintiffs contend that in most instances Macatawa failed to verify these changes. Macatawa responds that the level of

verification required was less than what Plaintiffs contend was required. The Court need not address what level of verification was required and whether Macatawa performed that level of verification, because Plaintiffs' insufficient verification breach of contract theory fails as a matter of law even if Macatawa did not perform the contractually required level of verification.

Plaintiffs contend that if Macatawa had properly verified all of the insurance documents, then Macatawa would not have released the investors' funds to TPI and instead would have returned the investors' funds to the investor. However, Plaintiffs do not allege that any of TPI's viatical settlements failed because the owner or beneficiary had not been changed. "The general rule in breach of contract actions is that damages recoverable for a breach of contract are those arising naturally from the breach or those which were within the parties' contemplation at the time of contracting." *Harris v. Citizens Ins. Co.*, 141 Mich. App. 110, 112, 366 N.W.2d 11 (1983) (citing *Kewin v. Mass. Mut. Life Ins. Co.*, 409 Mich. 401, 295 N.W.2d 50 (1980), and *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)). The damages Plaintiffs seek to recover for do not arise naturally from any failure by Macatawa to properly verify the insurance documents, but from an alleged failure of Macatawa to escrow funds sufficient to pay the insurance policy premiums. *Cf. Corl v. Huron Castings, Inc.*, 450 Mich. 620, 625-26, 544 N.W.2d 278 (1996) ("[T]he goal in contract law is not to punish the breaching party, but to make the nonbreaching party whole."). As Plaintiffs cannot show that any damages arise from Macatawa's failure to

verify the insurance documents, Plaintiffs' cannot sustain a breach of contract claim based on Macatawa having breached the escrow agreements by not verifying the insurance documents. Therefore, Macatawa is entitled to summary judgment as to Plaintiffs' breach of contract claims that are premised on a failure by Macatawa to verify insurance documents.

### 3. Escrow of premiums for plaintiffs who signed an escrow agreement with Macatawa

The Court must next address Plaintiffs' second breach of contract theory, that Macatawa breached its obligation to escrow funds for the payment of insurance policy premiums. The interpretation of contracts is a question of law. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47, 664 N.W.2d 776 (2003); *Archambo v. Lawyers Title Ins. Corp.*, 466 Mich. 402, 408, 646 N.W.2d 170 (2002). The contracts which the Court must interpret are escrow agreements, and under Michigan law,

> Where a person assumes to and does act as the depositary in escrow, he is absolutely bound by the terms and conditions of the deposit and charged with a strict execution of the duties voluntarily assumed. He is held to strict compliance with the terms of the escrow agreement. If he violates instructions or acts negligently, he is ordinarily liable for any loss occasioned by his breach of duty.

*Smith v. First Nat'l Bank & Trust Co. of Sturgis*, 177 Mich. App. 264, 270-271, 440 N.W.2d 915 (1989).

### a. Plaintiffs with escrow agreements with a revision date prior to October 15, 1998

Macatawa contends that it did not have an obligation to escrow funds for the payment of insurance policy premiums for investors with an escrow agreement with a

revision date prior to October 15, 1998. Plaintiffs contend that Macatawa had an obligation to escrow funds for the payment of premiums for investors with escrow agreements that have a revision date prior to October 15, 1998, but do not contend that this obligation arose from the text of the escrow agreements. (Pls.' Resp. in Opp'n 25; *Elkins* Pls.' Resp. in Opp'n 5 ("Before Ocotober 15, 1998, the [Escrow] Agreement did not specifically mention the obligation to escrow funds to pay premiums.").) Rather, Plaintiffs contend that Macatawa had an obligation to escrow funds for the payment of premiums based on three documents: (1) a June 4, 1997, letter from Christine Zmudka at TPI to Richard Deardorff at Macatawa (Farrell Aff.,[5] Ex. 31, Letter from Christine Zmudka, Principal, TPI, to Richard Deardorff, Grand Bank (June 4, 1997)), (2) a document titled "Trade Partners, Inc. Premium Reserve Account Procedures Outline" (Farrell Aff., Ex. 31, Premium Reserve Account Procedures Outline), and (3) a letter dated June 12, 1996, from Macatawa to TPI, which the parties agree should actually be dated June 12, 1997 (the "June 12, 1997, letter") (Farrell

---

[5] At oral argument on this motion Macatawa raised several questions about the Farrell Affidavit. The affiant of the Farrell Affidavit is Thomas Farrell, who appeared on behalf of Plaintiffs at the oral argument on this motion and who represents most of the plaintiffs in the cases comprising this MDL action. While it does not alter the outcome of this motion, the Court notes that it is novel and highly unusual for an attorney who represents parties in the lawsuit in which the affidavit is submitted to submit an affidavit of the type offered by Mr. Farrell. *See* 3 Am. Jur. 2d *Affidavits* § 4 (2008) ("[T]he appropriate party to attest to the facts is the plaintiff himself, not the plaintiff's attorney . . . ."). Although certain procedural contexts do necessitate that an attorney who represents parties in a lawsuit file an affidavit (*e.g.*, Dkt. No. 192, Macatawa's Br. in Supp of Mot. to Dismiss Teig and Goolsbay, Ex. A, Ulm Aff. (affidavit of an attorney for Macatawa regarding the failure of a plaintiff to attend her deposition)), Mr. Farrell's affidavit offers analysis of documents that go to the merits of Plaintiffs' claims. Mr. Farrell's affidavit places him in the odd position of putting his integrity before the Court as to the veracity of certain factual assertions made by Plaintiffs.

Aff., Ex. 32, Letter from Richard Deardorff, Vice President & Trust Officer, Grand Bank, to Thomas Smith and Christine Zmudka, TPI (June 12, 1996)). Plaintiffs contend that these documents imposed on Macatawa an obligation to ensure that the Premium Reserve Account had funds equal to one-and-one-half times the premium payments for the expected life of each viator. Plaintiffs further contend that the investors were the intended beneficiaries of these agreements.

"Before there can be a legally enforceable obligation there must be an offer and an acceptance." *Mathieu v. Wubbe*, 330 Mich. 408, 412, 47 N.W.2d 670 (1951). The June 4, 1997, letter from Christina Zmudka and the document titled "Trade Partners, Inc. Premium Reserve Account Procedures Outline," which was enclosed with Ms. Zmudka's letter, both originated from TPI. Assuming that the June 4, 1997, letter and the enclosure were an offer to contract from TPI, Plaintiffs have not provided any evidence that Macatawa signed or otherwise affirmatively accepted TPI's offer. Plaintiffs contend that the June 12, 1997, letter was an acceptance of the June 4, 1997, offer, but there is no language in the June 12, 1997, letter that supports this position. The June 12, 1997, letter does not acknowledge or reference the June 4, 1997, letter or the enclosure to the June 4, 1997, letter. (Letter from Richard Deardorff, Vice President & Trust Officer, Grand Bank, to Thomas Smith and Christine Zmudka, TPI (June 12, 1996).) In the absence of any reference to the June 4, 1997, letter or enclosure, the June 12, 1997, letter cannot be construed as an acceptance. Moreover, "'any material departure from the terms of an offer invalidates the offer as made,

and results in a counter proposition, which, unless accepted, cannot be enforced.'" *Harper Bldg. Co. v. Kaplan*, 332 Mich. 651, 655, 52 N.W.2d 536 (1952) (quoting *Carrollton Acceptance Co. v. Ruggles Motor Truck Co.*, 253 Mich. 1, 5, 234 N.W. 134 (1931)). The June 12, 1997, letter introduces the following fee structure:

> [Macatawa] will charge an annual fee of $500, which will be billed directly to Trade Partners. We will also receive a 12b-1 fee of .25% directly from the money market fund (prospectus included).

(*Id.*) Even if there was other language in the June 12, 1997, letter that indicated that the letter was intended as an acceptance, the addition of the fee structure in the June 12, 1997, letter converted the June 12, 1997, letter into a counteroffer.

The June 12, 1997, was an offer from Macatawa that was accepted by TPI. The June 12, 1997, letter states that "If the terms of this letter are agreeable to you, please sign where indicated at the bottom of this letter." (Letter from Richard Deardorff, Vice President & Trust Officer, Grand Bank, to Thomas Smith and Christine Zmudka, TPI (June 12, 1996).) Thomas J. Smith and Christine M. Zmudka both signed the letter on behalf of TPI. (*Id.*) Hence, the June 12, 1997, letter constituted a contract between TPI and Macatawa. The June 12, 1997, letter provides in pertinent part that:

> This letter will outline the terms of the above relationship between the Trust Department and Trade Partners. [Macatawa] will receive funds from Trade Partners to pay insurance policy premiums. [Macatawa] will hold these funds in an interest bearing money market account, which is currently yielding 5.1%. Upon authorization from Trade Partners, [Macatawa] will send a check directly to the appropriate insurance company for payment of the designated policy's annual premium. [Macatawa] will then notify Trade Partners of the completed transaction.

(*Id.*)  The June 12, 1997, letter indicates that TPI will provide Macatawa with the funds to be held for payment of insurance policy premiums.  This is directly contrary to Plaintiffs' contention that after receiving the funds from an investor, Macatawa was obligated to withhold the portion of those funds that were necessary for the payment of insurance policy premiums.  Most importantly, the terms of the June 12, 1997, letter do not require Macatawa to hold any funds in escrow.  The June 12, 1997, makes no reference to the funds being held in escrow, thus Macatawa would not have had authority to withhold funds if TPI made a request for disbursement.  *See Bell Bros. v. Bank One, Lafayette, N.A.*, 116 F.3d 1158, 1160 (7th Cir. 1997) ("Banks do not possess discretion over demand accounts.  A bank is obliged to honor the instructions of the depositor and account-holder.").  None of the three documents identified by Plaintiffs obligated Macatawa to escrow funds sufficient to pay insurance policy premiums.

The escrow agreements with revision dates prior to October 15, 1998, did not require Macatawa to escrow funds sufficient to pay insurance policy premiums.  Additionally, the three documents identified by Plaintiffs do not impose an obligation on Macatawa to escrow funds sufficient to pay insurance policy premiums.  Thus, there is no genuine issue of material fact as to Macatawa not having had an obligation to escrow funds sufficient to pay insurance policy premiums for escrow agreements with a revision date prior to October 15, 1998.  Macatawa is entitled to summary judgment as to the breach of contract claims premised on Macatawa having had an obligation to escrow funds for the payment of

insurance policy premiums for plaintiffs with escrow agreements with a revision date prior to October 15, 1998.

**b.** **Plaintiffs with escrow agreements with a revision date of October 15, 1998, through March 1, 2000**

Macatawa contends that it is entitled to summary judgment with respect to the obligation to escrow funds for the payment of insurance policy premiums imposed by escrow agreements with revision dates of October 15, 1998, through March 1, 2000.[6] "'The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate.'" *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197, 702 N.W.2d 106 (2005) (quoting *McIntosh v. Groomes*, 227 Mich. 215, 218, 198 N.W. 954 (1924)). The language of the parties "is the best way to determine what the parties intended." *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 476, 663 N.W.2d 447 (2003). "'A contract is said to be ambiguous when its words may reasonably be understood in different ways. . . . Yet if a contract, however inartfully worded or clumsily arranged, fairly admits of but one interpretation it may not be said to be ambiguous or, indeed, fatally unclear.'" *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566, 596 N.W.2d 915 (1999) (quoting *Raska v. Farm Bureau Mut. Ins. Co.*, 412 Mich. 355, 362, 314 N.W.2d 440 (1982)).

The escrow agreements, starting with the October 15, 1998, revision, contain

---

[6] Macatawa does not seek summary judgment with respect to the obligation to escrow funds for the payment of insurance policy premiums imposed by escrow agreement with revision dates after March 1, 2000.

language related to the escrow of funds for the payment of insurance policy premiums.  The

October 15, 1998, revision of the escrow agreement provides in pertinent part:

> 3.     <u>Restricted Account</u>.  The Escrow Account is a restricted-access account, previously established with the Escrow Agent.  It is hereby stated that Trade Partners shall not have access to Escrow Funds for any reason until the Escrow Agent receives the specified documents discussed in Section 4 of this Agreement and authorizes release of the Escrow Funds from the Escrow Account, a portion to Trade Partners and a portion to the Premium Reserve Account ("Premium Reserve Account") established by the Premium Escrow Agreement executed by Trade Partners and Escrow Agent on October 12, 1998.

> 4.     <u>Appointment of Escrow Agent</u>.  The parties hereto appoint The Grand Bank as Escrow Agent for the purpose of controlling the withdrawal of funds deposited herewith. . . . Release of Escrow Funds shall be at the sole discretion of the Escrow Agent.

> 5.     <u>Release of Funds</u>.  Escrow Agent will not authorize the release of Escrow Funds to Trade Partners, the viator, or any other third party until receipt of documents as set forth in Section 4 of this Agreement.  Upon receipt, Escrow Agent shall permit the removal of the restrictions on Escrow Funds and shall release the Escrow Funds to Trade Partners and to the Premium Reserve Account as directed by Trade Partners.  Escrow Agent shall rely on any document(s) which Escrow Agent reasonably believes satisfy(ies) the terms and conditions of the Escrow Agreement.

(Dkt. No. 141, Macatawa's Br. in Supp., Ex A.5, Escrow Agreement (rev. 10/15/1998) ¶¶

3-5.)  With one exception, the March 1, 1999, revision did not materially alter the pertinent

parts of escrow agreement.  The March 1, 1999, revision moved the last sentence of

paragraph four to the end of paragraph five.  (Macatawa's Br. in Supp. Ex. A.6, Escrow

Agreement (rev. 03/01/1999) ¶¶ 4-5.)  The March 1, 2000, revision made several changes,

and provides in pertinent part:

2. <u>Appointment of Escrow Agent</u>: In order to fulfill the purpose and intent of this Agreement, the parties hereto appoint Grand Bank as Escrow Agent for the purpose of controlling the withdrawal of funds deposited herewith. Escrow Agent is hereby instructed to restrict withdrawal of Escrow Funds from the Escrow Account until presented with specified documents.

3. <u>Restricted Account</u>: The Escrow Account is a restricted-access account. It is hereby expressly stated that Trade Partners shall not have access to Escrow Funds for any reason until Escrow Agent receives the specified documents discussed in Section 5 of this Agreement and authorizes release of Escrow Funds from the Escrow Account to Trade Partners and/or to the Premium Escrow Account established by the Premium Escrow Agreement executed by Trade Partners and Escrow Agent on October 12, 1998 ("Premium Escrow Account").

. . . .

5. <u>Release of Funds</u>: Escrow Agent shall not authorize the release of Escrow Funds to Trade Partners, the viator, or any other third party until presented with [the insurance documents]. Upon receipt and review of the documents listed above, Escrow Agent shall permit the removal of the restrictions on Escrow Funds and shall release Escrow Funds to Trade Partners and the Premium Escrow Account. Release of Escrow Funds shall be at the sole discretion of Escrow Agent. Escrow Agent shall rely on any document(s) which Escrow Agent reasonably believes satisfy(ies) the terms and conditions of the Escrow Agreement.

(Macatawa's Br. in Supp., Ex. A.7, Escrow Agreement (rev. 03/01/2000) ¶¶ 2-5.)

Macatawa contends that it was only obligated to follow the directions provided by TPI and that Plaintiffs have not offered any evidence that it failed to do so. Macatawa supports this contention with the following sentence from the fifth paragraph of the October 15, 1998, revision of the escrow agreement:

Upon receipt, Escrow Agent shall permit the removal of the restrictions on

Escrow Funds and shall release the Escrow Funds to Trade Partners and to the Premium Reserve Account as directed by Trade Partners.

(Escrow Agreement (rev. 10/15/1998) ¶ 5.)  The March 1, 1999, revision of the escrow agreement modifies this sentence by replacing the reference to the "Premium Reserve Account" with a reference to the "Premium Escrow Account."  (Escrow Agreement (rev. 03/01/1999) ¶ 5.)  The March 1, 2000, revision to the escrow agreement deleted the last four words of the sentence: "as directed by Trade Partners."  (Escrow Agreement (rev. 03/01/2000) ¶ 5.)

Macatawa contends that based on the "as directed by Trade Partners" language, so long as Macatawa followed the directions of TPI, it did not violate the escrow agreements.  As the language on which Macatawa relies is not present in the March 1, 2000, revision of the escrow agreement, there is a genuine issue of material fact as to what obligations the March 1, 2000, revision of the escrow agreement imposed on Macatawa with respect to the escrow of funds to pay insurance policy premiums.  With respect to the October 15, 1998, and March 1, 1999, revisions of the escrow agreements, Macatawa's proposed interpretation would mean that it would have been permissible, if TPI so directed, for Macatawa to release all of the escrow funds directly to TPI and none to the Premium Reserve/Escrow Account.  This interpretation disregards the "and" that follows the second "shall."  The use of the conjunctive indicates that Macatawa was obligated by the "shall" to split the release of any escrow funds between TPI and the Premium Reserve/Escrow Account.  Additionally, Macatawa's interpretation of "as directed by Trade Partners" is inconsistent with the last

sentence of the third paragraph of the October 15, 1998, and March 1, 1999, revisions of the escrow agreements. The last sentence of the third paragraph indicates that "a portion" of the escrow funds are to be released to the "Premium Reserve Account" in the October 15, 1998, revision and the "Premium Escrow Account" in the March 1, 1999, revision. (Escrow Agreement (rev. 10/15/1998) ¶ 3; Escrow Agreement (rev. 03/01/1999) ¶ 3.) This language in the third paragraph arguably required Macatawa to apportion the released escrow funds between TPI and the "Premium Reserve Account"/"Premium Escrow Account." The reference in the October 15, 1998, revision to the "Premium Reserve Account" and in the March 1, 1999, revision to the "Premium Escrow Account" are both linked to the Premium Escrow Agreement executed by TPI and Macatawa on or after October 15, 1998. (Escrow Agreement (rev. 10/15/1998) ¶ 3; Escrow Agreement (rev. 03/01/1999) ¶ 3.) The reference to the Premium Escrow Agreement suggests that the reference to the "Premium Reserve Account" in the October 15, 1998, revision was intended to refer to the "Premium Escrow Account," so both revisions arguably refer to the same account.

The reference to the Premium Escrow Agreement in the third paragraph further suggests that the October 15, 1998, and March 1, 1999, revisions of the escrow agreements may reasonably be understood in a manner contrary to Macatawa's proposed interpretation. Although not an operative part of the Premium Escrow Agreement, two recitals in the Premium Escrow Agreement support an interpretation of the escrow agreements that is contrary to Macatawa's proposed interpretation. The pertinent recitals state that:

D.  The Escrow Agreement [the escrow agreements between individual investors and Macatawa] provides for distribution of a portion of the Purchase Funds to a Premium Escrow Account (the "Premium Escrow Account") in an amount sufficient to pay at least one hundred percent (100%) of the amount of premiums that will become due during the life expectancy of the viator (the "Premiums") as determined by the third party medical review (the "Escrow Funds").

E.  The Company [TPI] and the Escrow Agent [Macatawa] desire to establish the Premium Escrow Account pursuant to this Agreement and thereby provide for the payment of Premiums when they become due and payable.

(Farrell Aff., Ex. 33, Premium Escrow Agreement (rev. 10/15/1998) ¶¶ D-E.)   In consideration of the entirety of the October 15, 1998, and March 1, 1999, revisions of the escrow agreements, those escrow agreements are ambiguous as to Macatawa's obligation to escrow funds to pay insurance policy premiums.  This ambiguity extends to the March 1, 2000, revision of the escrow agreements, because that revision removes the language that most directly supports Macatawa's position.   If a contract is ambiguous, then the interpretation of the contract is a question to be decided by the jury.  *See Klapp*, 468 Mich. at 469.  Therefore,  it will be for a jury to decide what obligations Macatawa had to escrow funds for the payment of insurance policy premiums under the escrow agreements with revision dates of October 15, 1998, through March 1, 2000.[7]

As the Court has determined that the escrow agreements with revision dates of

_____

[7]The Court does not extend this conclusion beyond the March 1, 2000, revision, because Macatawa did not move as to any of the later revisions.  Thus, the Court's opinion should not be read to indicate whether Macatawa's obligations under the post-March 1, 2000, revisions are jury questions.

October 15, 1998, through March 1, 2000, are ambiguous as to Macatawa's obligations to escrow premiums, the Court cannot reach the further question of whether Macatawa breached its obligations. The declaration of Brian Downs and Plaintiffs' motion to disregard Mr. Downs's declaration both relate to the question of whether Macatawa breached those obligations. Therefore, Plaintiffs' motion to disregard the declaration of Brian Downs will be denied as moot.

      **4.      Plaintiffs Ronald and Rebecca Maier's breach of contract claim against Macatawa**

In the *Adamson v. Macatawa* case, Plaintiffs Ronald and Rebecca Maier move for partial summary judgment as to their breach of contract claim against Macatawa. Plaintiffs Maiers contend that Macatawa breached its obligation to escrow funds to pay insurance policy premiums. (File No. 1:07-CV-750, Dkt. No. 105, Maiers' Br. in Supp. 5-6.) Plaintiffs Maiers' motion is based on the version of the escrow agreement they signed, which was the October 15, 1998, revision of the escrow agreement. (Maiers' Mot. for Partial Summ. J., Ex. A, Maier Escrow Agreement (rev. 10/15/1998).) As the Court has determined that the October 15, 1998, escrow agreement is ambiguous as to Macatawa's obligations to escrow funds to pay insurance policy premiums, there is necessarily a genuine issue of material fact as to whether Macatawa breached that obligation with respect to Plaintiffs Maiers. Therefore, Plaintiffs Maiers' motion for partial summary judgment will be denied.

### 5. Plaintiffs who invested in TPI's limited liability companies

Macatawa moves for summary judgment as to the breach of contract claims of plaintiffs who invested in TPI's limited liability companies ("LLCs"). TPI sold interests in LLCs that would purchase and hold viatical settlements. Investors in TPI's LLCs were promised a specific monthly return, though the individual investor did not acquire a direct interest in any viatical settlement. The LLCs did have escrow agreements with Macatawa. Macatawa contends that its escrow agreements with the LLCs only required Macatawa to receive change of beneficiary forms before releasing funds and did not impose an obligation to escrow funds for the payment of premiums.

Plaintiffs acknowledge that the escrow agreements between the LLCs and Macatawa (the "LLC escrow agreements") did not require Macatawa to escrow funds for the payment of premiums. (Pls.' Resp. in Opp'n 31; *see also* Macatawa's Br. in Supp., Ex. D.1, LLC Escrow Agreement (rev. undated); Macatawa's Br. in Supp., Ex. D.2, LLC Escrow Agreement (rev. 06/15/1999); Macatawa's Br. in Supp., Ex. D.3, LLC Escrow Agreement (rev. 04/22/2000).) However, Plaintiffs contend that the LLC escrow agreements did require Macatawa to verify certain insurance documents and that the insurance policies underlying the LLCs had death benefits at least equal to the amount of escrow funds to be disbursed. Macatawa is entitled to summary judgment with respect to Plaintiffs' contentions regarding the insurance documents for the LLC escrow agreements for the same reason that Macatawa is entitled to summary judgment with respect to insurance documents for the

escrow agreements between Macatawa and individual investors, which is that the damages Plaintiffs seek to recover for do not arise naturally from any failure by Macatawa to properly verify the insurance documents. *See supra* Section III.B.2 - *Verification of insurance policy documents for plaintiffs who signed an escrow agreement with Macatawa.*

With respect to the requirement that the insurance policies underlying the LLCs had death benefits at least equal to the amount of escrow funds to be disbursed, Plaintiffs contend that there is a genuine issue of material fact as to whether Macatawa complied with these obligations based on a February 18, 2003, internal Macatawa memorandum from Robert T. Worthington. (Farrell Aff., Ex. 25, Memorandum from Robert T. Worthington to TPI Monthly Income LLC Files (Feb. 18, 2003).) Mr. Worthington's memorandum states that:

> A review of the documentation within the LLC files and the relating documentation maintained on the LLC Collateral spreadsheets for the TPI Monthly Income LLCs, resulted in identifying the following information:
>
> The LLC Collateral spreadsheets are updated regularly to reflect the current status of available collateral (i.e. all historical information is saved over), as contrasted with reflecting the available collateral at the time of a disbursement. Accordingly, it is possible for a spreadsheet to give the perception that disbursements occurred with insufficient collateral. In these cases, adequate collateral was indeed available at the time of disbursement, however the subsequent updating of the spreadsheet resulted in adjustment to the total available collateral balance.

(*Id.*) Plaintiffs direct the Court to the language that "it is possible for a spreadsheet to give the perception that disbursements occurred with insufficient collateral." (*Id.*) Mr. Worthington indicates that the spreadsheets could be read to indicate that the

disbursements occurred with insufficient collateral; however, he explicitly indicates that such a reading of the spreadsheets would be an error and provides an explanation of why such a reading would be an error. Plaintiffs have not offered any other materials to support the contention that Macatawa disbursed funds without verifying that the insurance policies underlying the LLCs had death benefits at least equal to the amount of escrow funds to be disbursed. The only evidence offered indicates that "adequate collateral was indeed available at the time of disbursement," therefore there is no genuine issue of material fact that Macatawa verified that the insurance policies underlying the LLCs had death benefits at least equal to the amount of escrow funds to be disbursed prior to having disbursed funds. Macatawa is entitled to summary judgment as to the breach of contract claims of plaintiffs who invested in TPI's LLCs .

## C.    Negligence claims

Macatawa moves for summary judgment as to Plaintiffs' negligence claims on two bases. First, Macatawa moves for summary judgment on the negligence claims of plaintiffs who did not have escrow agreements with Macatawa because Macatawa did not owe such plaintiffs a duty. Second, Macatawa moves for summary judgment on the negligence claims of Plaintiffs who had an escrow agreement with Macatawa because the escrow agreements contain a limitation of liability and release for any claims of negligence.

### 1.    Plaintiffs who did not have escrow agreements with Macatawa

Under Michigan law the elements of negligence are: duty, breach of that duty,

causation, and damages. *Fultz v. Union-Commerce Assocs.*, 470 Mich. 460, 463, 683 N.W.2d 587 (2004). "The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff. 'It is axiomatic that there can be no tort liability unless defendants owed a duty to plaintiff.'" *Id.* at 463 (*Beaty v. Hertzberg & Golden, P.C.*, 456 Mich. 247, 262, 571 N.W.2d 716 (1997)). "'Duty is essentially a question of whether the relationship between the actor and the injured person gives rise to any legal obligation on the actor's part for the benefit of the injured person.'" *Christy v. Glass*, 415 Mich. 684, 693, 329 N.W.2d 748 (1982) (quoting *Moning v. Alfono*, 400 Mich. 425, 438-39, 254 N.W.2d 759 (1977)). To determine if a party owes a duty to another several factors must be considered: "the relationship of the parties, the foreseeability of the harm, the burden that would be imposed on the defendant, and the nature of the risk presented." *In re Certified Question from Fourteenth Dist. Court of Appeals of Tex.*, 479 Mich. 498, 508, 740 N.W.2d 206 (2007). "Where there is no relationship between the parties, no duty can be imposed, but where there is a relationship, the other factors must be considered to determine whether a duty should be imposed." *Id.* at 508-09. Macatawa contends that it did not have a contractual relationship with Plaintiffs who did not sign escrow agreements, so it owed them no duty. Plaintiffs' response merely contends that their arguments on the breach of contract claim addressed this issue. Plaintiffs fail to articulate a basis on which Macatawa owed a duty to Plaintiffs who did not sign escrow agreements. As Plaintiffs have not sustained their summary judgment burden, Macatawa is entitled to summary judgment on the negligence claims of Plaintiffs who did not have an escrow agreement with Macatawa.

**2.      Effect of the limitation of liability and release in the escrow agreements**

Macatawa moves for summary judgment on the negligence claims of Plaintiffs who had an escrow agreement with Macatawa because the escrow agreements contain a limitation of liability and release for any claims of negligence. "[T]he validity of a contract of release turns on the intent of the parties." *Paterek v. 6600 Ltd.*, 186 Mich. App. 445, 448-49, 465 N.W.2d 342 (1990) (citing *Trongo v. Trongo*, 124 Mich. App. 432, 435, 335 N.W.2d 60 (1983)), *modified on other grounds Patterson v. Kleiman*, 447 Mich. 429, 433-34, 526 N.W.2d 879 (1994). A release is valid if it is fairly and knowingly made. *Denton v. Utley*, 350 Mich. 332, 342, 86 N.W.2d 537 (1957). "A release is not fairly made and is invalid if (1) the releasor was dazed, in shock, or under the influence of drugs, (2) the nature of the instrument was misrepresented, or (3) there was other fraudulent or overreaching conduct." *Paterek*, 186 Mich. App. at 449 (citing *Theisen v. Kroger Co.,* 107 Mich. App. 580, 582-83, 309 N.W.2d 676 (1981)).

The escrow agreements provide:

11.    <u>Obligations and Duties of Escrow Agent</u>. The obligations and duties of Escrow Agent under this Escrow Agreement are limited as follows:

        . . . .

        11.2    <u>Limited Liability</u>. Escrow agent may act upon any written notice, request, waiver, consent, certificate, receipt, authorization, power of attorney, or other instrument or document which Escrow Agent in good faith believes to be genuine and to be what it purports to be. Anything in this Agreement to the contrary notwithstanding, Escrow Agent shall not be liable to any party to this Agreement for anything which it may do or refrain from doing in connection with this Agreement, unless Escrow Agent is guilty of gross negligence

of [*sic*[8]] willful misconduct.

. . . .

12.  <u>Release of Escrow Agent</u>.  The parties hereto release the Escrow Agent
and its employees from any damages, losses or expenses which either
party may sustain or incur, unless the same is a direct result of the
gross negligence or intentional misconduct of Escrow Agent.  Escrow
Agent shall be protected in any action taken or omitted in good faith
with respect to its duties and responsibilities under the provisions of
this Escrow Agreement.

(Escrow Agreement (rev. undated) ¶¶ 11, 11.2, 12.)[9]  The LLC escrow agreements contain

materially similar limitations of liability and releases.  (LLC Escrow Agreement (rev.

undated) ¶¶ 5, 5.b, 6;  LLC Escrow Agreement (rev. 06/15/1999) ¶¶ 5, 5.b, 6; LLC Escrow

Agreement (rev. 04/22/2000) ¶¶ 6, 6.b. 6.[10])

Macatawa contends that it is entitled to summary judgment on the negligence claims

based on this language in the escrow agreements and LLC escrow agreements.  Plaintiffs

---

[8]This error was corrected (replacing "of" with "or") in the January 1, 1998, and later
revisions of the escrow agreement.  (*E.g.*, Macatawa's Br. in Supp., Ex. A.3, Escrow
Agreements (rev. 01/01/1998) ¶ 11.2.)

[9]This same language appears without material change in the later revisions of the
escrow agreement. ( Macatawa's Br. in Supp., Ex. A.2, Escrow Agreement (rev.
03/21/1997) ¶¶ 11, 11.2, 12;   Escrow Agreement (rev. 01/01/1998) ¶¶ 11, 11.2, 12;
Macatawa's Br. in Supp., Ex. A.4, Escrow Agreement (rev. 05/27/1998) ¶¶ 11, 11.2, 12;
Escrow Agreement (rev. 10/15/1998) ¶¶ 11, 11.2, 12; Escrow Agreement (rev. 03/01/1999)
¶¶ 11, 11.2, 12; Escrow Agreement (rev. 03/01/2000) ¶¶ 10, 10.b, 11; Macatawa's Br. in
Supp., Ex. A.8, Escrow Agreement (rev. 06/20/2000) ¶¶ 10, 10.b, 11; Macatawa's Br. in
Supp., Ex. A.9, Escrow Agreement (rev. 09/15/2000) ¶¶ 10, 10.b, 11; Macatawa's Br. in
Supp., Ex. A.10, Escrow Agreement (rev. 09/20/2001) ¶¶ 10, 10.b, 11;  Macatawa's Br. in
Supp., Ex. A.11, Escrow Agreement (rev. 03/08/2002) ¶¶ 10, 10.b, 11.)

[10]The April 22, 2000, revision of the LLC escrow agreement contains two paragraphs
numbered "6."

contend that the escrow agreements were obtained by fraud and that therefore the releases in the escrow agreements are invalid. However, Plaintiffs fail to offer any evidence to support the allegation that the limitations of liability and releases in the escrow agreements and LLC escrow agreements were obtained by fraud. As Plaintiffs have failed to offer any evidence in support of their contention that the limitations of liability and releases in the escrow agreements and escrow agreements were obtained by fraud, as a matter of summary judgment, the limitations of liability and releases are valid. *See Brooks v. Holmes*, 163 Mich. App. 143, 144-46, 413 N.W.2d 688 (1987) (*per curiam*) (affirming a trial court's decision that a release was valid in a case in which the plaintiffs alleged fraud, misrepresentation, and negligence as to the underlying transaction, but not as to the release).

Plaintiffs also contend that even if the limitations of liability and releases are valid, Macatawa's negligence extended beyond the escrow agreements and LLC escrow agreements, thus Macatawa's negligence is outside the scope of the limitations of liability and releases in the escrow agreements and LLC escrow agreements. The principal other document upon which Plaintiffs rely is the Premium Escrow Agreement. The Premium Escrow Agreement contains a limitation of liability and release that is materially similar to the limitations of liability and releases in the escrow agreements and LLC escrow agreements. (Premium Escrow Agreement (rev. 10/15/1998) ¶¶ 5, 5.b, 6.) Hence, any negligence claims based on the Premium Escrow Agreement are barred to the same extent as negligence claims are barred by the escrow agreements and LLC escrow agreements. Plaintiffs also argue that Macatawa was negligent in its actions wholly apart from its role as

33

escrow agent and so those actions are outside of the scope of any of the limitations of liability or releases. This contention by Plaintiffs fails because in response to another portion of Macatawa's motion, Plaintiffs were unable to articulate any duties that Macatawa owed to Plaintiffs that could support a negligence claim outside of the duties arising from the escrow agreements, LLC escrow agreements, and Premium Escrow Agreement. (*See* Pls.' Resp. in Opp'n 34-35 (referring to Plaintiffs' arguments on the breach of contract claim in response to Macatawa's argument that Plaintiffs' negligence claims failed because they allege no duty beyond the contractual duties ).) Therefore, Macatawa is entitled to summary judgment as to Plaintiffs' negligence claims being barred by the limitations of liability and releases in the escrow agreements, LLC escrow agreements, and Premium Escrow Agreement.

## D.    Fraudulent inducement claims

Macatawa moves for summary judgment as to the fraudulent inducement claims of Plaintiffs who had no pre-purchase contact with Macatawa. Plaintiffs' fraudulent inducement claims are based on a fraud by omission theory. Under Michigan law, the elements of fraud by omission are:

> "(1) a material representation which is false; (2) known by defendant to be false, or made recklessly without knowledge of its truth or falsity; (3) that defendant intended plaintiff to rely upon the representation; (4) that, in fact, plaintiff acted in reliance upon it; and (5) thereby suffered injury. . . . The false material representation needed to establish fraud may be satisfied by the failure to divulge a fact or facts the defendant has a duty to disclose. Such an action is one of fraudulent concealment."

*McMullen v. Joldersma*, 174 Mich. App. 207, 213, 435 N.W.2d 428 (1988) (omission in *McMullen*) (quoting *Jaffa v. Shacket*, 114 Mich. App. 626, 640-41, 319 N.W.2d 604 (1982)). Plaintiffs' fraudulent inducement claims are addressed to the time period prior to any given plaintiff deciding to invest, so Macatawa could only have had a duty to disclose based on either (1) pre-purchase contact between a plaintiff and Macatawa, or (2) a pre-purchase contract imposing a duty to disclose on Macatawa. Because Macatawa does not move as to Plaintiffs who had pre-purchase contact with it, the Court need not consider the first category. With respect to the second category, Plaintiffs claim Macatawa made representations to Plaintiffs that Macatawa would protect their investments and Macatawa failed to do so. However, assuming *arguendo* that Macatawa had a pre-purchase duty to disclose to Plaintiffs who did not have contact with Macatawa, "a claim of fraud in the inducement, by definition, redresses misrepresentations that induce the buyer to enter into a contract but that do not in themselves constitute contract or warranty terms subsequently breached by the seller." *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.*, 209 Mich. App. 365, 375, 532 N.W.2d 541 (1995). Plaintiffs implicitly acknowledge that their fraudulent inducement claims are based on the terms of the escrow agreements by stating: "By proferring the Escrow Agreements to investors, the Bank made a promise to escrow funds, without disclosing its intent not to perform." (Pls.' Resp. in Opp'n 36.) Therefore, Macatawa is entitled to summary judgment as to the fraudulent inducement claims of Plaintiffs who had no pre-purchase contact with Macatawa because the fraudulent

inducement claim of such Plaintiffs is based on the representations in the escrow agreements.

**E.    Application of the economic loss doctrine to Plaintiffs' negligence, gross negligence, and breach of fiduciary duty claims**

Macatawa moves for summary judgment as to Plaintiffs' negligence, gross negligence, and breach of fiduciary duty claims based on Michigan's economic loss doctrine. The economic loss doctrine "has firm roots in Michigan jurisprudence." *Huron Tool and Eng'g Co.*, 209 Mich. App. at 369 (collecting cases). Under Michigan law, the economic loss doctrine bars an action in tort based on the same duty as would give rise to an action for breach of contract. *Rinaldo's Const. Corp. v. Mich. Bell Tel. Co.*, 454 Mich. 65, 83, 559 N.W.2d 647 (1997). An action in tort must be based on "'some breach of duty distinct from breach of contract.'" *Id.* ((quoting *Hart v. Ludwig*, 347 Mich. 559, 563, 79 N.W.2d 895 (1956)). "[T]he threshold inquiry is whether the plaintiff alleges violation of a legal duty separate and distinct from the contractual obligation.'" *Id.* at 84. The application of the economic loss doctrine under Michigan law has not been limited to contracts for the sale of goods. *Rinaldo's Const. Corp.* 454 Mich. at 84-85 (applying the economic loss doctrine to a telephone service contract); *TIBCO Software, Inc. v. Gordon Food Serv., Inc.*, No. 1:03-CV-25, 2003 WL 21683850, at *3 (W.D. Mich. July 3, 2003) ("Michigan courts have not limited the principles of *Neibarger* [*v. Universal Cooperatives, Inc.*, 439 Mich. 512, 486 N.W.2d 612 (1992),] to contracts for the sale of goods." (citations omitted)).

Plaintiffs contend that Macatawa had duties as a fiduciary apart from its contractual duties based on Macatawa's role as trustee of the TPI Grand Trust. The TPI Grand Trust was a Delaware business trust formed on September 3, 1998. (Farrell Aff., Ex. 7, TPI Grand Trust - Trust Agreement.) Thus, Plaintiffs offer no basis for Macatawa's duties, apart from its contractual duties, prior to September 3, 1998. It is undisputed that Macatawa was the Property Trustee of the TPI Grand Trust. (TPI Grand Trust - Trust Agreement 1.) In denying class certification in *Jenkins v. Macatawa* the Court addressed Macatawa's duties and liabilities as Property Trustee of the TPI Grand Trust:

> The trust agreement gave the Property Trustee the power to: (i) establish bank accounts for the trust, (ii) receive death benefits from the policies and (iii) to distribute the proceeds from the policies in accordance with the trust agreement. ([TPI Grand Trust - Trust Agreement] ¶ 5.2.) The trust agreement also expressly limits the Property Trustee's liability to violations of the aforementioned duties. (*Id.* at ¶ 5.3(b).) Delaware law permits a business trust agreement to impose such limitations on liability. Del. Code Ann. tit. 12 § 3806(e) (2006) ("A governing instrument may provide for the limitation or elimination of any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a trustee . . . to a . . . beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument . . . .").

(File No. 1:03-CV-321, Dkt. No. 679, 11/09/2006 Am. Op. 23-24 (omissions in the Court's prior opinion).) In pertinent part paragraph 5.3(a) of the TPI Grand Trust - Trust Agreement provides:

> [T]he Property Trustee shall have no duty or liability with respect to the administration of the Trust, investment of the Trust's property or distributions to the Unit-holders, and no implied obligations on the part of the Property Trustee shall be inferred from this Trust Agreement.

(TPI Grand Trust - Trust Agreement ¶ 5.3(b).)   Thus, the TPI Grand Trust - Trust Agreement, cannot have imposed any duties on Macatawa beyond those explicitly delineated in the trust agreement.   As the TPI Grand Trust did not impose any duties on Macatawa beyond Macatawa's contractual duties, Plaintiffs have failed to identify "a legal duty separate and distinct from the contractual obligation." *Rinaldo's Const. Corp.*, 454 Mich. at 84.

Plaintiffs specifically challenge the application of the economic loss doctrine to their breach of fiduciary duty claims.   In support of this Plaintiffs direct the Court to following statement from *Evans v. Singer*, 518 F. Supp. 2d 1134 (D. Ariz. 2007): "outside the product liability context, the [economic loss] doctrine has produced difficulty and confusion." *Evans*, 518 F. Supp. 2d at 1140 (quoting *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 874 (9th Cir. 2007)).   The *Evans* court was applying Arizona law, *id* at 1139-40, and in this MDL action the non-securities law claims are governed by Michigan law.   ( Op. re Choice-of-Law 24;  Order re Choice-of-Law 1.)   While other jurisdictions may not apply the economic loss doctrine to breach of fiduciary duty claims, Michigan does. *Scarff Bros., Inc. v. Bischer Farms, Inc.*,  546 F. Supp. 2d 473, 487-88 (E.D. Mich. 2008) (finding plaintiff's claims of negligence, innocent or fraudulent misrepresentation, silent fraud, breach of fiduciary duty, breach of bailment, and common law and statutory conversion barred by Michigan's economic loss doctrine);  *cf. Huron Tool and Engineering Co.*, 209 Mich. App. at 370-71 (listing possible exceptions to the application of the economic loss

doctrine in Michigan, but not identifying breach of fiduciary duty as a possible exception). Therefore, as a matter of law, Plaintiffs' negligence, gross negligence, and breach of fiduciary duty claims are barred by the economic loss doctrine.[11]

## F.    Michigan Uniform Securities Act Claims

Macatawa moves for summary judgment with respect to Plaintiffs' claims under the Michigan Uniform Securities Act ("MUSA").  However, only the *Jenkins* Plaintiffs assert a claim under the MUSA.  (*Jenkins* Second Am. Consol. Class Action Compl. ¶¶ 70-71.) The other Plaintiffs assert their state securities law claims under the laws of Oklahoma and Texas.  (*Adamson* Pls.' Sixth Am. Compl. ¶¶ 56-58 (alleging a violation of Texas securities law); *Bailey* Pls.' Fourth Am. Compl. ¶¶ 56-58 (alleging a violation of Texas securities law); *Elkins* Pls.' Compl. ¶ 37 (alleging a violation of Oklahoma securities law); *Myers* Pls.' Third Am. Compl. ¶¶ 56-59 (alleging a violation of Texas securities law).)  Thus, this portion of Macatawa's motion only applies to the *Jenkins* Plaintiffs. Macatawa moves for summary judgment on the MUSA claim based on the contention that there is no genuine issue of material fact as to Macatawa not having been either the seller or the person who controlled the seller of unregistered securities.

---

[11]Apart from moving for summary judgment on the negligence and breach of fiduciary duty claims based on the economic loss doctrine, Macatawa also moved for summary judgment based on the duties underlying the negligence and breach of fiduciary duty claims being equivalent to Macatawa's contractual duties.  As Macatawa only provided limited analysis in support of this argument (Macatawa's Br. in Supp. 10-11), the Court declines to separately analyze what could be described as an explanation of the purpose of the economic loss doctrine.

The Court previously determined that viatical settlements are securities under the MUSA. (Dkt. No. 211, 04/15/2008 Op. 13-16.)  Section 301(1) of the MUSA requires that all securities offered or sold in Michigan be registered with the State of Michigan.[12] M.C.L.A. § 451.701(1) (West 2008).[13]  TPI's viatical settlement products were not registered with the State of Michigan.  The *Jenkins* Plaintiffs allege that under section 410 of the MUSA Macatawa "was a seller, or a person who directly or indirectly controlled a seller, of unregistered securities . . . ." (*Jenkins* Second Am. Consol. Class Action Compl. ¶ 70.)

Section 410 of the MUSA provides:

(a)    Any person who does either of the following is liable to the person buying the security from him or her . . . :

(1)    Offers or sells a security in violation of [the MUSA].

. . . .

(b)    Every person who directly or indirectly controls a seller liable

---

[12]There are exceptions to the section 301 registration requirement, M.C.L. § 451.701(2-3); however, no party has suggested that any of those exceptions were applicable to TPI's viatical settlements.

[13]"In 2000 the Michigan Legislature revised the MUSA. 2000 Mich. Pub. Acts 494. The revisions were effective January 11, 2001."  (11/09/2006 Am. Op. 26 n.5.)  The revisions changed M.C.L. §§ 451.701, .801, and .810; however, the revisions did not alter the elements for the MUSA claims asserted by the *Jenkins* Plaintiffs.  *Compare* M.C.L.A. § 451.701 (West 2000) *with* M.C.L.A. § 451.701 (West 2008); *compare* M.C.L.A. § 451.801 (West 2000) *with* M.C.L.A. § 451.801 (West 2008); *compare* M.C.L.A. § 451.810 (West 2000) *with* M.C.L.A. § 451.810 (West 2008).  For simplicity, in the remainder of the opinion the Court only cites to the post-revision version of the statute, *i.e.*, M.C.L.A. § 451.701 (West 2008).

> under subsection (a), every partner, officer, or director of the
> seller, every person occupying a similar status or performing
> similar functions, every employee of the seller who materially
> aids in the sale, and every broker-dealer or agent who materially
> aids in the sale are also liable jointly and severally with and to
> the same extent as the seller, unless the person sustains the
> burden of proof that he or she did not know, and in exercise of
> reasonable care could not have known, of the existence of the
> facts by reason of which the liability is alleged to exist. There
> is contribution as in cases of contract among the several persons
> so liable.

M.C.L.A. § 451.810(a-b) (West 2008). Section 410(a) of the MUSA does not impose aider and abetter liability. *Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.*, 713 F. Supp. 1019, 1028 (W.D. Mich. 1989).

### 1. Seller under the MUSA

The MUSA does not define "seller." Federal cases interpreting the federal securities laws have defined who constitutes a "seller," and Michigan courts refer to federal securities law in interpreting the MUSA. *Michelson v. Voison*, 254 Mich. App. 691, 695, 658 N.W.2d 188(2003); *Michigan v. Breckenridge*, 81 Mich. App. 6, 16-17, 263 N.W.2d 922 (1978). The federal securities statutes do not define "seller;" however, the United States Supreme Court has defined "seller" under federal securities law. In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court defined "seller" under section 12(1) of the Securities Act of 1933 as a

> person who successfully solicits the purchase, motivated at least in part by a
> desire to serve his own financial interests or those of the securities owner. If
> he had such a motivation, it is fair to say that the buyer "purchased" the
> security from him and to align him with the owner in a rescission action.

486 U.S. at 647. In applying this test to a claim under section 12(2) of the Securities Act of 1933, the Sixth Circuit phrased the test as "whether the defendant either passed title or offered to do so, or solicited an offer." *Smith v. Am. Nat'l Bank and Trust Co.*, 982 F.2d 936, 942 (6th Cir. 1992). The *Jenkins* Plaintiffs contend that there is a genuine issue of material fact as to whether Macatawa was either a direct seller or a solicitor seller of TPI's viatical settlements.

The *Jenkins* Plaintiffs contend that Macatawa is a direct seller because Macatawa participated in the transfer of title to the viatical settlement to individual investors. Under the MUSA, "security" includes "investment contracts," M.C.L.A. § 451.801(z) (West 2008),[14] and

> an investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.

*S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).[15] The *Jenkins* Plaintiffs contend that under this definition, each component of the *Jenkins* Plaintiffs' transaction must be considered and that when those components are considered there is a genuine issue of

---

[14]Prior to the 2000 amendments to the MUSA, "security" was defined by M.C.L.A. § 451.801(l) (West 2000).

[15]In *Department of Commerce v. DeBeers Diamond Investment, Ltd.*, 89 Mich. App. 406, 411, 280 N.W.2d 547 (1979), Michigan adopted the *Howey* test for what constitutes an "investment contract." *Rzepka v. Michael*, 171 Mich. App. 748, 759, 431 N.W.2d 441 (1988); *Michigan v. Cooper*, 166 Mich. App. 638, 646-47, 421 N.W.2d 177 (1987).

material fact as to whether Macatawa was a direct seller of securities. The purchase of a TPI viatical settlement typically required an investor to enter into an agency/policy funding agreement with TPI and an escrow agreement with Macatawa. Under this structure, the profits that an investor could expect would, at a minimum, be based on how long the viator lived, TPI's performance under the agency/policy funding agreement, and Macatawa's performance under the escrow agreement.

Macatawa contends that this application of the definition of "investment contract" does not satisfy the requirements of either *Pinter* or *Howey*, and directs the Court to *Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir. 1989). In *Schlifke*,

> ENI Corporation ("ENI") sold limited partnership interests in ENI Exploration Program 1981-III ("ENI 1981-III"), a limited partnership organized to engage in oil and gas exploration and managed by ENI Exploration Company . . . . ENI obtained financing for the 1981-III program from Seattle-First National Bank . . . . Under the terms of the executed Loan Agreement, borrowings by ENI 1981-III were to be secured by letters of credit from investors, equivalent to 116% of each investor's financial commitment to the program. The Bank established certain criteria for banks issuing letters of credit to ensure that they were financially secure. By arranging these letters of credit to secure the Bank's loan to the exploration program and by assuming a proportionate share of the indebtedness pursuant to an Assumption Agreement, investors were afforded a tax deduction without any initial cash outlay.

*Id.* at 938. Two investors filed suit after ENI 1981-III defaulted on its loan and Seattle-First National Bank demanded payment on the letters of credit. *Id.* The plaintiffs in *Schlifke* argued that the entire transaction between the plaintiffs, Seattle-First National Bank, and ENI constituted an "investment contract." *Id.* at 941. The plaintiffs' theory was that the bank had an expectation of profit in the loan, which was guaranteed by the plaintiffs' letters

of credit, from both the fixed rate of interest on the loan and from an increased likelihood that the other debt owed by ENI and its associates would be repaid.  The Seventh Circuit explained that the bank's involvement had been limited to a "mere 'commercial' loan transaction" because the fixed interest payments the bank would receive from the loans were not "profits" in the context of securities law.  *Id.* at 941-42.  As to the increased likelihood of repayment on other debt, the Seventh Circuit indicated that this was not properly understood as profits, because this money was already owed to the bank.  *Id.* at 942.

Although the court in *Schlifke* did reject the application of *Howey* put forward by the plaintiffs in the case before it as "contrived," the structure of the purchase of TPI's viatical settlements is distinguishable from the plaintiffs' theory in *Schlifke*. First, Macatawa was not involved with TPI as a commercial lender.  Second, the bank in *Schlifke* had no contact with sales personnel and did not otherwise promote the investment, *id.* at 941, while genuine issues of material fact remain as to Macatawa's involvement in the marketing and promotion of TPI's viatical settlements.  Third, the theory espoused by the plaintiffs in *Schlifke* classified them as co-investors with the bank in the loan.  In contrast the *Jenkins* Plaintiffs make no contention that Macatawa was a co-investor in the viatical settlements.  The *Jenkins* Plaintiffs' theory is more akin to them having invested in the joint efforts of TPI, Macatawa, and the viator.  Under application of the definition of an "investment contract" in *Howey*, there are genuine issues of material fact as to whether Macatawa, as a direct seller, "passed title, or other interest in the security, to the buyer for value."  *Pinter*, 486 U.S. at 642 (citing 3 L. Loss, *Securities Regulation* 1016 (2d ed. 1961)).

Macatawa also argues that it is entitled to summary judgment because it did not have "direct contact" with the *Jenkins* Plaintiffs.[16] A solicitor seller, who is not the actual owner is not barred from being a seller, but to be a seller, such a person must have "urge[d] a prospective purchaser to buy." *Am. Nat'l Bank and Trust Co.*, 982 F.2d at 941. Macatawa contends that in a prior case the Court concluded under *Pinter* and *American National Bank and Trust Co.* that there must be direct contact between the seller and the purchaser. *Montcalm County Bd. of Comm'rs v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225, 1232 (W.D. Mich. 1993) ("'*Pinter* apparently requires someone to be an issuer or a paid participant who actually contacted a buyer and urged the buyer to purchase before such

---

[16]Macatawa contends that the Court previously ruled on this question in its amended opinion denying class certification. Macatawa references the following language from the the Court's November 9, 2006, amended opinion:

> Resolving whether Grand Bank was a "seller" will at a minimum involve questions about whether an investor met or spoke with a Grand Bank representative and whether the investor received any materials produced by Grand Bank. . . . Individual questions predominate as to the sale of unregistered securities claim because the representations made to each investor will determine whether Grand Bank was a "seller" with respect to that investor.

(11/09/2006 Am. Op. 26-27.) This language from the Court's prior opinion is consistent with the Court's analysis of Macatawa's motion for partial summary judgment. The Court's opinion denying class certification acknowledged the significance of certain facts to the MUSA claims, but the opinion does not indicate that a MUSA claim necessarily fails if those facts are not established. Moreover, nothing in the Court's analysis of Macatawa's motion for partial summary judgment suggests that Macatawa having met with an investor, Macatawa having spoken with an investor, or an investor having received materials produced by Macatawa is irrelevant to whether Macatawa was a seller under section 410(a) of the MUSA.

participant would meet the first prong of the solicitation test.'" (quoting Joseph E. Reece, *Would Someone Please Tell Me the Definition of the Term 'Seller': The Confusion Surrounding Section 12(2) of the Securities Act of 1933*, 14 Del. J. Corp. L. 35, 105 (1989))). In *Montcalm County Board of Commissioners* the Court's decision did not rest on whether there had been direct person-to-person contact, because in that case there had indisputably been direct person-to-person contact. *Id.* at 1232-33 (discussing the telephone calls between the plaintiff and the defendant). Rather, in *Montcalm County Board of Commissioners* the Court concluded that the defendant had not "urged" the plaintiff to invest because the contacts between the plaintiff and the defendant "were always initiated by plaintiff, except for the occasional reminder of a maturing investment." *Id.* at 1233. Thus, *Montcalm County Board of Commissioners* cannot be read to have held that direct person-to-person contact is required.

Lastly, Macatawa directs the Court to several cases with statements to the effect that a plaintiff "must demonstrate direct and active participation in the solicitation of the immediate sale," *In re Craftmatic Securities Litigation*, 890 F.2d 628, 636 (3d Cir. 1989) (citations omitted), which is not wholly distinct from the Sixth Circuit's phrasing in *American National Bank and Trust Co.* However, the Court need not parse any such distinctions because there are genuine issues of material fact as to whether Macatawa directly and actively participated in the solicitation of the sales of TPI's viatical settlements and as to whether Macatawa urged prospective purchasers to buy TPI's viatical settlements.

(*E.g.*, Farrell Aff., Ex. 30, Tr. of Champions of Indus. Video; Farrell Aff., Ex. 49, Letter from Richard Deardorff, Vice President and Trust Officer, Grand Bank, to Harry Robinson (June 26, 1998) ("Per our conversation earlier this week, I have enclosed some literature regarding Grand Bank for use in your presentations to your clients.").)  The existence of genuine issues of material fact as to Macatawa having been a solicitor seller is typified by a letter from Richard Deardorff, who was a vice president and trust officer at Macatawa, which states in pertinent part:

> . . . Grand Bank now serves in the capacity of Trustee for the TPI/Grand Trust, issues monthly interest checks and pays premium payments for policies owned by Trade Partners.  For these services, Grand Bank is paid a fee by Trade Partners, Inc., which is wholly paid by the corporation and not by any assets of any of the accounts.
>
> In the three years we have dealt with Trade Partners, Inc., our dealings with them have been very satisfactory.  As of this date, we believe the principals of Trade Partners to be honest and trustworthy people and certainly of high business and ethical standards.  Our relationship with them would not exist if this were not true.  Nor would it have been as successful.  Our estimates show that over $326 million have flowed through the Trade Partners accounts at Grand Bank over the last three years.

(Farrell Aff., Ex. 52, Letter from Richard Deardorff, Vice President and Trust Officer, Grand Bank, to Sean Quinn, Capital Group (Barbados), Inc., (Dec. 2, 1999).)[17]  At minimum

---

[17]The Court notes that it is not readily apparent whether exhibits 49 and 52 to the Farrell Affidavit were part of transactions involving the *Jenkins* Plaintiffs, who are the only plaintiffs who assert claims under the MUSA.  If the exhibits were not part of transactions involving the *Jenkins* Plaintiffs, then the exhibits may be distinguishable from the materials involved in the transactions made by the *Jenkins* Plaintiffs.  Nevertheless, Macatawa made no such contention in its briefing or at oral argument, thus the Court must conclude that exhibits 49 and 52 were part of transactions involving the *Jenkins* Plaintiffs or that the

(continued...)

these materials indicate that there is a genuine issue of material fact as to Macatawa's role having been greater than the bank in *American National Bank and Trust Co.*, which had only advised a borrower at the bank that the bank would terminate its relationship with the borrower unless the borrower found a third-party (the plaintiff) to sign a note to cover certain indebtedness of the borrower to the bank. 982 F.2d at 939. On consideration of the materials before the Court, there are genuine issues of material fact as to whether Macatawa, as a solicitor seller, urged prospective purchasers to buy.

As the Court has concluded that there are genuine issues of material fact as to Macatawa being either a direct seller or a solicitor seller, Macatawa is not entitled to summary judgment that it was not a seller under section 410(a) of the MUSA

2. **A person who controls a seller under the MUSA**

Macatawa moves for summary judgment that it was not a person who controlled a seller under section 410(b) of the MUSA. Plaintiffs did not address this issue in their response to Macatawa's motion. Therefore, as Plaintiffs have not met their summary judgment burden on this issue, Macatawa is entitled to summary judgment that it was not a person who controlled a seller under section 410(b) of the MUSA.

**IV. Conclusion**

For the foregoing reasons, Plaintiffs' and Macatawa's motions are granted and denied

---

[17](...continued)
exhibits are representative of documents that were part of transactions involving the *Jenkins* Plaintiffs.

as follows. Plaintiffs Ronald and Rebecca Maier's motion for partial summary judgment on their breach of contract claim is denied. *See supra* Section III.B.4. Plaintiffs' motion to disregard the declaration of Brian Downs is denied as moot. *See supra* Section III.B.3.b. Macatawa's motion for partial summary judgment is granted in part and denied in part. Macatawa's motion for partial summary judgment is granted as to the negligence, gross negligence, and breach of fiduciary duty claims of all plaintiffs. *See supra* Sections III.C, III.E. Macatawa's motion for partial summary judgment is granted as to the *Jenkins* Plaintiffs' MUSA claims that are premised on Macatawa having been a person who controlled a seller of unregistered securities. *See supra* Section III.F.2. Macatawa's motion for partial summary judgment is granted as to the breach of contract and fraudulent inducement claims of certain categories of plaintiffs as set forth in this opinion. *See supra* Section III.A, III.B.1, III.B.3.a, III.B.5, III.D. Macatawa's motion for partial summary judgment is denied as to the *Jenkins* Plaintiffs' MUSA claims that are premised on Macatawa having been a seller of unregistered securities. *See supra* Section III.F.1. Macatawa's motion for partial summary judgment is also denied on the breach of contract claims of all plaintiffs with an escrow agreement with a revision date of October 15, 1998, through March 1, 2000. *See supra* Sections III.B.3.b. An order will be entered consistent with this opinion.

Dated: <u>August 15, 2008</u>                    <u>/s/ Robert Holmes Bell</u>
                                                 ROBERT HOLMES BELL
                                                 UNITED STATES DISTRICT JUDGE